**Abdeen M. JABARA, Plaintiff,**

v.

**Clarence M. KELLEY et al., Defendants.**

**Civ. A. No. 39065.**

United States District Court,
E. D. Michigan, S. D.

June 9, 1977.

John Shattuck, New York City, and Ronald Reosti, Detroit, Mich., for plaintiff.

R. John Seibert, U.S. Dept. of Justice, Civ. Div., Washington, D.C., and S. Michael Wicks, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This is a motion by the plaintiff to compel answers to interrogatories pursuant to Rule 37(a)(2) of the Federal Rules of Civil Procedure. Two similar motions were previously filed by the plaintiff and were decided by the Court in Memorandum Opinions dated March 21, 1974 and June 27, 1975.[1] The facts of this case are reported in *Jabara v. Kelley et al.*, 62 F.R.D. 424 (E.D.Mich.1974).

On December 3, 1975, plaintiff served his third set of supplemental interrogatories on the defendants, to which the defendants responded on February 6, 1976. The defendants answered some of the interrogatories and objected in whole, or in part, to others. The defendant's objections, which are at issue by this motion, involve interrogatories numbered 3(d) and (e), 10, 13, 14, 17, 19, 21, 22, 31, 39 and 40.[2]

The plaintiff, Abdeen M. Jabara, an attorney, originally filed this civil action in 1972, seeking declaratory and injunctive relief, and invoking this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331(a), 1361, 2201 and 2202. On January 17, 1975, plaintiff was granted leave to amend his complaint to include a claim for wiretap damages under 18 U.S.C. § 2520.[3] By his amended complaint, plaintiff alleges that the defendants, individually and in their official capacity, have authorized and conducted an intensive investigation of his daily activities since 1967 in a manner that has interfered with his freedom of speech and association, his right of privacy, and his right to be free from unreasonable searches and seizures. The plaintiff specifically alleges violations of the First, Fourth, Fifth, Sixth and Ninth Amendments to the United States Constitution as well as 18 U.S.C. §§ 2511, 2520.

Since the filing of the original complaint in 1972, the battleground of the litigation in this case has been fought over plaintiff's right to compel discovery. In order to obtain information which the plaintiff contends is vital to the proof of his claims, he has served numerous requests on the defendants for answers to interrogatories, for production of documents, and requests to admit.[4] Although the defendants have responded to many of these requests, admitting a substantial number of plaintiff's allegations, the defendants have consistently refused to comply with other relevant requests on various grounds of executive privilege.[5]

---

1. *Jabara v. Kelley, et al*, 62 F.R.D. 424 (E.D. Mich.1974), and *Jabara v. Kelley, et al*, Civil No. 39065 (E.D.Mich. June 27, 1975) (unpublished opinion).

2. Subsequent to the filing of this motion, the plaintiff withdrew his request to compel answers to interrogatories numbered 32 and 38.

3. The plaintiff was also granted leave to amend for purposes of including certain specific factual allegations based upon the general allegations in his complaint and to include an additional allegation of jurisdiction under 28 U.S.C. § 1343(4).

4. Since the filing of this lawsuit in 1972, the plaintiff has made five separate requests for answers to interrogatories. Plaintiff's original request for answers to interrogatories was filed on January 12, 1973, followed by four separate sets of supplemental requests filed on February 5, 1973; August 5, 1974; December 5, 1975, and January 2, 1976, respectively. (The January 2, 1976, request for answers to interrogatories was filed while this motion was pending.) In addition, the plaintiff has also filed two separate requests for production of documents on August 5, 1974, and March 7, 1975, as well as a request for admissions filed on January 12, 1973.

5. The defendants have repeatedly objected to many of plaintiff's requests on the ground that such information was "privileged from disclo-

In objecting to plaintiff's discovery requests on the grounds of privilege, the defendants have repeatedly argued that the information sought by the plaintiff involved sensitive governmental matters which, in the national interest, should not be disclosed. Because the complaint in this case sets forth non-frivolous allegations of substantial constitutional violations, the Court has given the most careful consideration to each claim of privilege to insure that it is exercised with utmost fairness and caution. In each instance, the Court has scrutinized the claim to determine the precise governmental interest underlying defendants' need for maintaining secrecy and has balanced that interest against plaintiff's showing of necessity for the requested information.

Since the balancing of interests in this case has been a fragile and time consuming process, the Court has been compelled to oversee the discovery process to a greater extent than in most cases. In ruling on prior discovery motions, the Court has provided the parties with general discovery guidelines for resolving further problems based upon claims of executive privilege. These guidelines were fashioned in light of the balance of interests that the Court must strike in ruling on any claim of privilege and were designed specifically for the purpose of facilitating an early determination of the merits of this case. Regrettably, the Court's guidelines for discovery have not served the intended purpose for which they were established. Instead of facilitating

the resolution of future discovery problems, the guidelines have served as merely another basis for differences of opinion as to the scope and application of the guidelines in subsequent discovery requests.

The dispute over guidelines and the problems they have generated is vividly illustrated by the discovery motion now before the Court. As they have argued in the past, the defendants have again refused to answer a number of plaintiff's interrogatories on the basis of their conclusion that they need not respond to such questions. In almost each instance, the defendants have predicated their objection on the guidelines the Court has established in ruling on prior discovery motions. While the Court believes that the defendants, as well as the plaintiff, have presented their positions on discovery in good faith, it does appear that the interpretation placed upon the Court's guidelines has been strained to the point where a discussion of guidelines no longer serves any useful purpose.[6]

For purposes of the pending discovery motion, the Court has carefully reviewed each claim of executive privilege that has been asserted by the defendants. In reviewing each of these claims of privilege, the Court has determined the application and scope of the privilege to the subject matter relevant to plaintiff's pending discovery requests. In ruling on these claims, the Court has attempted to delineate the exact bounds of discovery that will be permitted on a particular subject matter in the

---

sure in the public interest and in the interest of the national defense and foreign policy and on the ground that such disclosure would compromise ongoing investigations and jeopardize investigative techniques." Beyond this general assertion of privilege, the defendants have specifically claimed privileges against: (1) the disclosure of the identity of informers; (2) information pertaining to ongoing investigations; (3) information involving policy discussion matters, as distinguished from factual data; (4) information relating to investigatory files, and (5) matters that would disclose tactical intelligence or current investigatory techniques.

**6.** In establishing guidelines for discovery, this Court has indicated in prior decisions that each guideline may be accorded varying degrees of importance, depending on the relevance and nature of the information sought, and that additional factors may become relevant depending on the precise problem presented to the Court. The Court's guidelines were thus never intended to be woodenly applied in other contexts nor were they intended to serve as an exhaustive list for purposes of resolving future discovery problems between the parties. These guidelines were merely offered to give the parties some guidance in order to facilitate further discovery problems.

Although the Court now refrains from further discussion of guidelines, nothing stated in this opinion is meant to displace what has been previously held in the prior opinions of this Court.

context of a given request. The Court believes that this procedure will now permit the parties, once and for all, to complete all discovery proceedings in this case.

This lawsuit has remained in discovery since 1972 and the Court believes that the parties have had more than a sufficient opportunity to prepare their prospective legal theories for a decision on the merits. With the Court's ruling on this motion in mind, it is now time for the parties to assess the information they have obtained through discovery, to frame the issues, and to submit their arguments for decision.

## I.

■ At the outset, it is essential to emphasize the court's role in determining whether to uphold or overrule the claims of executive privilege asserted in this case. In ruling on claims of privilege, it is not the court's role to make legal determinations on the merits of the dispositive issues in the case. This is particularly relevant to this case because the dispositive issues are simply too important to decide in the context of a discovery motion without briefs and argument addressed solely to those issues. Although the parties have requested the Court in prior discovery motions to consider and determine the legal merits of plaintiff's claims, the Court has been firm in its refusal to do so. In this Court's view such a procedure would be contrary to the nature of our adversary system and would likely result in an unsatisfactory decision.

■ In deciding to uphold or overrule claims of executive privilege, the Court's role is limited to a determination of three fundamental questions: (1) Whether the claim falls within one of the categories of privileges recognized in the law of evidence; (2) Whether the claim has been properly invoked, and (3) Whether the circumstances of this case are appropriate for the exercise of the claim.[7] Underlying these deceptively simple questions is the more difficult task of determining the proper accommodation that must be struck between competing fundamental interests.[8] There is, on the one hand, the undeniable interest of the executive branch of government in maintaining confidentiality over certain types of information necessary for the performance of its constitutional duties. There is, on the other hand, the unquestionable interest of the litigant in seeking certain information necessary for a just resolution of the legal dispute as well as the public interest in favor of safeguarding basic constitutional freedoms. Finally, there is also the perplexing separation of powers questions that are always lurking in the background of any claim of executive privilege.[9]

■ In light of the balance of interest that must be struck in this case, it is also essential to emphasize that claims of executive privilege, like other evidentiary privileges, must be narrowly construed, to permit the broadest possible discovery otherwise allowed under the Federal Rules of Civil Procedure.[10] The governmental interest in favor of maintaining confidentiality under the cloak of privilege must be tempered by the historical function of the courts to provide compulsory process for the production of relevant evidence needed for

**7.** See e. g., *Black v. Sheraton Corp. of America*, 371 F.Supp. 97, 100 (D.D.C.1974).

**8.** As the Court explained in *Kinoy v. Mitchell*, 67 F.R.D. 1, 6 (S.D.N.Y.1975):

It seems almost superfluous to comment in the context of recent events to comment that this is an area of the law of great complexity, in which persons in all branches of government must carefully balance and accommodate competing fundamental values. Both Congress and the Supreme Court have spoken clearly in favor of safeguarding individual privacy and freedom of expression, and have emphasized that the discretion of the Executive branch is

not absolute. Yet equally clearly the Executive must be afforded the discretion, even secrecy, necessary to exercise its proper function, which certainly includes preserving the nation's security from both foreign and domestic attack.

**9.** *See, e. g., United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). *See generally,* Berger, *The Incarnation of Executive Privilege*, 22 U.C.L.A.L.Rev. 4 (1974); *Comment,* 76 Col.L.Rev. 142 (1976).

**10.** *Kinoy v. Mitchell*, 67 F.R.D. 1, 14 (S.D.N.Y. 1975).

a fair and just determination of the legal dispute. "The need to develop all relevant facts in the adversary system is both fundamental and comprehensive." [11] To ensure that justice is done in this case, the Court will therefore initially weigh the balance of interest in favor of discovery of all relevant facts needed for a fair and just determination of the dispute. It is in keeping with these considerations that the Court has examined defendant's claims of executive privilege.

The starting point for determining whether to uphold or overrule a claim of privilege is Rule 26 of the Federal Rules of Civil Procedure. That rule, which applies to the Federal government as well as any other civil litigant, provides that discovery is permitted as to "any matter, not privileged, which is relevant to the subject matter involved in the pending action." For purposes of Rule 26, the term privilege is defined by the rules of evidence. [12] Rule 501 of the Federal Rules of Evidence, in turn, provides that "the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The claims of privilege asserted by the defendants in objecting to plaintiff's third set of supplemental interrogatories ostensibly fall within two principal recognized categories. First, there is the assertion of claims of executive privilege based upon military or state secrets. This privilege, which is not to be lightly invoked, has been recognized by the United States Supreme Court in *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The consequences of upholding a claim of privilege based upon military or state secrets are grave since the privilege absolutely protects against disclosure. [13] The second category of privileges asserted by the defendants falls within various recognized claims of qualified privilege. This category includes claims of privilege that have been asserted to protect from disclosure the identity of governmental informers, [14] information pertaining to ongoing criminal investigations, [15] administrative reports and opinions that reflect policy as distinguished from factual information, [16] and matters of tactical intelligence involving current investigatory techniques. [17] These claims of privilege are not absolute. They may be overcome by plaintiff's showing of necessity for the requested information, where the plaintiff's need is found to outweigh the governmental interest favoring secrecy.

Of course, as a threshold matter, the plaintiff has the burden of showing that the information he seeks is relevant and material to the proofs of his claims before the Court is even obligated to consider whether defendants' claims of privilege should be upheld in a particular instance. [18] If the plaintiff cannot, as a preliminary matter, demonstrate relevancy and materiality then it would be difficult for this Court to find that the particular discovery request would either have a major effect on accurate adjudication or that the need for the information would outweigh the harm which might be caused by disclosure. In any event, the Court would deny the discovery request

11. *United States v. Nixon, supra*, 418 U.S. at 709, 94 S.Ct. at 3108.

12. *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

13. *See United States v. Reynolds, supra*, at 10–11, 73 S.Ct. 528 (1953). *See* also *Kinoy v. Mitchell, supra*, at 8, and authorities cited therein.

14. *See, e. g., Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *Black v. Sheraton Corp. of America, supra*.

15. *See, e. g., Timken Roller Bearing Co. v. United States*, 38 F.R.D. 57 (N.D.Ohio 1964); *Kinoy v. Mitchell, supra*.

16. *See, e. g., Wood v. Breier*, 54 F.R.D. 7 (E.D. Wis.1972); *Kinoy v. Mitchell, supra*.

17. *See* note 15, *supra*.

18. *See, e. g., United States v. Reynolds, supra*, 345 U.S. at 11, 73 S.Ct. 528 (1953); *Committee for Nuclear Responsibility v. Seaborg*, 149 U.S. App.D.C. 385, 463 F.2d 788, 792 (1971).

without even considering the merits of defendants' claim of privilege.[19]

## II.

Defendants' objections to plaintiff's interrogatories numbered 13, 14, 19, 21 and 22 are based upon claims of executive privilege that had been previously lodged by William B. Saxbe, then Attorney General of the United States, and former Secretaries of Defense, James R. Schlesinger and Donald H. Rumsfeld.[20] The Schlesinger-Rumsfeld claim has been recently supplemented and renewed by Secretary of Defense Harold Brown.[21] These claims of executive privilege are based upon a number of sealed exhibits classified "Secret" and "Top Secret" that have been submitted to the Court by the defendants for an *in camera* inspection in support of the claims. These claims are clearly an attempt to assert the well established privilege of the government that absolutely protects from disclosure information concerning military or state secrets.

Although some of the *in camera* documents submitted in support of these claims of executive privilege had been considered by the Court in ruling on plaintiff's previous discovery motions, the Court had not, until now, determined the merits of these claims. In prior discovery motions, the Court expressly refrained from ruling on

these claims because the parties had not sufficiently briefed and argued the important and difficult issues underlying the claims. Moreover, since the discovery requests in dispute on prior motions were not clearly covered by these claims of privilege, the Court was able to resolve the discovery dispute within the Court's general discovery guidelines without necessitating a ruling on the formal claim asserted. The Court has now, however, had sufficient written and oral argument of the parties on the relevant issues and the Court believes that the discovery requests in dispute by this motion clearly necessitate a ruling on the merits of each claim of privilege.

### A. THE SAXBE CLAIM OF EXECUTIVE PRIVILEGE

The formal claim of executive privilege asserted by William B. Saxbe, as Attorney General of the United States, was lodged by way of affidavit which was filed on December 16, 1974.[22] In his affidavit, Saxbe states that a claim of privilege is asserted in "opposition to any disclosure to the plaintiff by the defendants of documents and information concerning the interception through certain national security electronic surveillance of any conversations or communications to which plaintiff was a party or in which any acts or activities of plaintiff were discussed . . . ."[23] The Saxbe

---

**19.** It is essential to note that the plaintiff has at least made a presumptive showing of relevancy and materiality for some of the information he is presently seeking. As the Court has found in ruling on a prior discovery motion:

. . . a reading of the complaint and the interrogatories and requests for admissions, convinces this court that without at least some of the information sought, the plaintiff would be hard pressed to either prove his claim(s) or be satisfied that the government had not unlawfully infringed upon his rights. 62 F.R.D. at 431.

That conclusion applies with equal force to much of the information requested by plaintiff's motion pending before the Court.

**20.** The affidavit and claim of executive privilege of William B. Saxbe was filed on December 16, 1974. The claim of James R. Schlesinger, dated December 13, 1974, is contained in a sealed document, labeled "Exhibit B," and was submitted to the court for *in camera* inspection

on December 16, 1974. The claim of Donald H. Rumsfeld, dated April 30, 1976, is also contained in a sealed document that was submitted to the Court for *in camera* inspection on July 19, 1976.

**21.** The affidavit and claim of executive privilege of Harold Brown is contained in a sealed document that was submitted to the Court for *in camera* inspection on March 15, 1977.

**22.** This affidavit and claim of privilege was submitted to the Court during oral arguments on plaintiff's second motion to compel answers to interrogatories on December 16, 1974. At that time, the defendants also submitted two sealed *in camera* exhibits in support of their claims.

**23.** The Saxbe affidavit further states that he reserves "the opportunity to submit a further affidavit and claim of privilege in opposition to

affidavit also refers to the affidavits of former Secretary of Defense, James R. Schlesinger, and Special Agent Robert F. Peterson of the Federal Bureau of Investigation (FBI). These affidavits are contained in sealed documents classified "Secret" and "Top Secret" that were submitted to the Court for an *ex parte, in camera* inspection.[24] The Schlesinger affidavit is purported to assert a claim of privilege over "documents and information relating to certain foreign national security electronic surveillance." The Peterson affidavit is purported to set forth the factual basis for the FBI's investigation.

The Saxbe affidavit is significant in that it revealed for the first time that plaintiff's conversations or communications concerning the plaintiff had been intercepted by the FBI on thirteen (13) separate wiretaps. Each of these wiretaps was authorized by the Attorney General at the time, without prior judicial approval, over a two-year period beginning in September, 1972, and continued up until May, 1974.

Saxbe claims in his affidavit that the documents and information concerning these thirteen (13) "national security electronic surveillances" are privileged because the surveillances "were deemed necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power or to obtain foreign intelligence information deemed essential to the security of the United States." The materials pertaining to these wiretaps are claimed to be privileged against disclosure other than to the Court, *in camera*, on the ground

that the disclosure of the particular facts, except the dates of the interceptions (previously furnished to the plaintiff), would "prejudice the public interest and the national security."

The factual allegations upon which the Saxbe claim is based is clearly an attempt to assert the privilege against disclosure of military or state secrets. This privilege, which has been well established and has never been doubted, prohibits the disclosure of information relating to national defense, military affairs, international relations and related activities of national preparedness.[25] The occasion for the privilege is appropriate whenever there is a "reasonable danger" that disclosure of the information would reveal matters which, in the interest of national security, should not be disclosed.

Although the origins of the military or state secrets privilege can be traced as far back as Aaron Burr's trial in 1807,[26] the seminal decision of the Supreme Court on this privilege is *United States v. Reynolds, supra.* *Reynolds* was a case arising under the Federal Torts Claims Acts in which the widows of three civilians killed in the crash of a military plane sought discovery of a classified Air Force report on the accident. At the time of the crash, the plane had been testing highly classified electronic equipment for strategic national defense purposes. The government claimed, *inter alia*, that the classified accident report was privileged because it contained military or state secrets. In the majority opinion, Chief Justice Vinson concluded that a formal claim of privilege by the Secretary of the Air

---

any disclosure to the plaintiff of any other information requested should it be necessary to do so following the Court's rulings on the objections which have been interposed by the defendants with respect thereto."

**24.** The *in camera* affidavit of Special Agent Robert F. Peterson, dated December 10, 1974, is contained in a sealed document labeled "Exhibit A" and was submitted to the Court on December 16, 1974, the same date on which the Schlesinger affidavit was submitted, which is labeled "Exhibit B".

**25.** See *Kinoy v. Mitchell, supra*, at 8; 8 Wigmore, Evidence. (McNaughton rev.) § 2378(2).

Although the term "military or state secrets" is amorphous in nature, it should be defined in the light of "reason and experience," much in the same way that the term "national defense" has been defined in 18 U.S.C. § 793; *i. e.*, a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *Gorin v. United States*, 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941).

**26.** *United States v. Burr*, 25 F.Cas. 55 (No. 14693) (C.C.D.Va.1807). *See* 8 Wigmore, *Evidence* (McNaughton rev.1961) § 2378(2), n. 5.

Force would be sufficient to cut off further demands for the disclosure of the report, when it was made "under circumstances indicating a reasonable possibility that military secrets [are] involved."[27] Although Justice Vinson found ample judicial precedent in support of the privilege, his opinion expressed two major considerations.

The first consideration is that the courts must ensure that the claim of privilege is substantiated by the government's showing that disclosure of the information sought might reveal military or state secrets. It is the courts, and not the executive officer claiming the privilege, who must determine whether the claim is based upon valid concerns. At the same time, the courts must also consider the litigant's actual need for the requested information and balance that need against the strength of the government's showing in support of the claim. The standard of review was stated by Chief Justice Vinson as follows:

In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. *A fortiori*, where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail. 345 U.S. at 11, 73 S.Ct. at 533. [Footnotes omitted]

The other major consideration is that judicial inquiry into the underlying substance of the claim should not be carried to the point where validation of the claim would result in the disclosure of the very information the privilege was designed to protect.[28]

The court's role is limited to the question of whether the privilege was claimed under circumstances indicating a *reasonable possibility* that military or state secrets would be revealed. Again, as Chief Justice Vinson explained in *Reynolds*:

It may be possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged. When this is the case, the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers. 345 U.S. at 10, 73 S.Ct. at 533. *See also United States v. Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973).

In addition to these considerations, the majority opinion in *Reynolds* also indicates that certain procedural requirements must be initially satisfied to properly assert the privilege. These requirements were found to be established in the principles and procedures which the law had already prescribed. They were specifically designed to ensure that the claim is made in light of valid concerns and were apparently developed with the idea that an improperly asserted claim of privilege is no claim of privilege at all.[29] The Court stated these requirements as follows:

The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party. It is not to be lightly invoked. There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. 345 U.S. at 7–8, 73 S.Ct. at 532.

---

**27.** *United States v. Reynolds, supra*, 345 U.S. at 11, 73 S.Ct. at 533.

**28.** As Chief Justice Vinson stated in *Reynolds*:

The court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a

disclosure of the very thing the privilege is designed to protect. 345 U.S. at 8, 73 S.Ct. at 532.

**29.** *See Black v. Sheraton Corporation of America, supra*, at 101.

In this case the plaintiff has made a sufficiently strong showing for the need of at least some of the information that defendants have refused to disclose on the basis of Saxbe's formal claim of privilege. It is now irrefutably established that plaintiff's conversations or communications concerning the plaintiff have been intercepted by the FBI on thirteen (13) separate wiretaps, all without prior judicial approval. Each of these wiretaps was authorized after the Supreme Court had held in *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), that prior judicial approval is required for electronic surveillance in the area of *domestic* security intelligence.[30] The defendants have repeatedly argued, however, that the warrantless electronic surveillance in this case was conducted pursuant to lawful *foreign* security intelligence. Moreover, in response to plaintiff's interrogatories, the defendants have claimed that the "subject of such surveillance was an individual or organization reported to be an agent of or acting in collaboration with a foreign power at the time such interceptions occurred."[31]

The Supreme Court in the *Keith* case, of course, expressly indicated in its decision that it was reserving judgment on the question of whether warrantless electronic surveillance may be lawful where foreign powers are involved. As the majority opinion in *Keith* states:

> Further, the instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country. The Attorney General's affidavit in this case states that the surveillances were "deemed necessary to protect the nation from attempts of *domestic organizations* to attack and subvert the existing structure of Government." [Emphasis supplied] There is no evidence of any involvement, directly or indirectly of a foreign power. 407 U.S. at 309, 92 S.Ct. at 2132.[32]

The factual allegations underlying the Saxbe affidavit as well as defendants' contentions and answers to interrogatories therefore squarely pose the very question that the Supreme Court in *Keith* left open for future decision.[33] To litigate that question, the plaintiff would certainly need to know at least the factual basis upon which

---

**30.** Saxbe's affidavit states that authorizations for the electronic surveillances of plaintiff's conversations "were approved by former Attorney General Kleindienst on September 14, 1972; September 15, 1972; September 18, 1972 (two separate surveillances); September 21, 1972; October 6, 1972; November 29, 1972; March 16, 1973; May 10, 1973 and May 21, 1973; by former Attorney General Richardson on June 15, 1973; and by me as Attorney General on March 21, 1974 and May 29, 1974 . . . ."

The *Keith* case was decided by the United States Supreme Court on June 19, 1972. *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

**31.** Defendants' response to Plaintiff's Third Supplemental Interrogatories, dated February 6, 1976, 12.

**32.** It is significant that the majority opinion in *Keith* goes on to state in a footnote that:

> Although we attempt no precise definition, we use the term "domestic organization" in this opinion to mean a group or organization (whether formally or informally constituted) composed of citizens of the United States and which has no significant connection with a foreign power, its agents or agencies. No doubt there are cases where it will be difficult to distinguish between "domestic" and "foreign" unlawful activities directed against the Government of the United States where there is collaboration in varying degrees between domestic groups or organizations and agents or agencies of foreign powers. But this is not such a case. 407 U.S. at 309, n. 8, 92 S.Ct. at 2133.

**33.** Subsequent to the *Keith* decision, the D.C. Circuit has, however, decided *Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975), a case that is analogous to the instant case. In *Zweibon*, Judge J. Skelly Wright held that "even where foreign affairs are involved, the President must obtain a warrant when the domestic organization which is the subject of the surveillance is neither an agent of nor acting in collaboration with the foreign power posing the national security threat." 516 F.2d at 602. (Although the Court has reviewed the relevant caselaw in this area, the court has reached no view, one way or the other, on the merits of this important question. A determination of the merits must wait further briefs and arguments of the parties.)

the defendants have determined that the subject of thirteen (13) FBI wiretaps was an agent or organization acting or collaborating with a foreign power. The plaintiff has requested that very information by one of the interrogatories at issue in this motion [34] and the defendants have refused to answer on the grounds of Saxbe's affidavit and claim of privilege.

Since this evidence is highly relevant and material to the issues in this case and because the plaintiff does not have alternative sources for obtaining this evidence, plaintiff's showing of necessity is particularly compelling. An *in camera* inspection of Saxbe's claim of privilege is therefore warranted on the basis of plaintiff's need and in view of the fact that the claim as set forth in the affidavit is otherwise unsubstantiated.

The Supreme Court has long held the view that *in camera* review is a highly appropriate and useful means for examining claims of privilege.[35] The plaintiff has requested, however, that parties and their legal representatives be involved in the *in camera* process so that they may aid the Court in its inspection of claims of privilege. The plaintiff has suggested that the confidentiality of the *in camera* submissions in support of the claims could be adequately preserved by the use of a protective order banning public disclosure of the information presumably pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

■ The Court has carefully considered plaintiff's request and has concluded that the plaintiff and his legal representative should be denied access to the classified *in camera* exhibits submitted in support of the claims prior to the Court's examination of the material and its determination of the validity of the claims. When a claim of military or state secrets privilege is lodged, the court must determine the validity of the claim without revealing the contents of the allegedly privileged materials. This, of course, precludes an open-court hearing on the matter. It also precludes any prior dissemination that would jeopardize the security which the privilege is meant to protect. Even the Court should not insist upon an *in camera* examination of all the evidence underlying the claim if the evidence before the Court indicates a reasonable danger that military or state secrets might be revealed.[36]

Contrary to plaintiff's suggestion, *in camera* review of claims of executive privilege involves vastly different considerations than those involved in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968), and its progeny. In *Alderman*, the Supreme Court held that it would be inappropriate for the court to conduct an *ex parte, in camera* review of electronic surveillance records for purposes of determining whether unlawfully intercepted conversations were "arguably relevant" to a *criminal* conviction. That holding was expressly premised upon the view that the possibility of error in determining relevancy by *in camera* proceedings was too great to justify dispensing with adversary proceedings.[37] In the case of claims of mili-

---

**34.** Plaintiff's Third Supplemental Interrogatories, dated February 6, 1976, 13.

**35.** *See, e. g., Kerr v. United States District Court*, 426 U.S. 394, 405–6, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976); *United States v. Nixon, supra*, 418 U.S. at 706, 94 S.Ct. 3090; *United States v. Reynolds, supra*.

**36.** *United States v. Reynolds, supra*, 345 U.S. at 711, 73 S.Ct. 528.

**37.** Even in the *Alderman* setting, the Supreme Court has suggested that *in camera* proceedings may be warranted under appropriate circumstances. In *Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969),

the court concluded that the *Alderman* holding was limited to situations where the surveillance had been determined to be in violation of the Fourth Amendment. Justice Stewart, concurring, suggested that this preliminary determination might be made in *ex parte, in camera* proceedings. Moreover, in *Taglianetti v. United States*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969), the Court rejected defendants' request to examine additional surveillance records to establish that he might be a party to some other conversations. Distinguishing *Alderman*, the Court found that the trial judge could be expected to identify defendant's voice without the defendant's assistance.

tary or state secrets' privilege, however, the superiority of well-informed advocacy becomes less justifiable in view of the substantial risk of unauthorized disclosure of privileged information. As the court stated in *Heine v. Raus*, 399 F.2d 785, 791 (4th Cir., 1968):

> Disclosures *in camera* are inconsistent with the normal rights of a plaintiff of inquiry and cross-examination, of course, but if the two interests cannot be reconciled, the interest of the individual litigant must give way to the government's privilege against disclosure of its secrets of state.

In view of the potential risks of disclosure, the Court is satisfied that there is a sufficiently valid justification for *in camera* review of claims of privilege based upon military or state secrets. There also seems little reason not to allow the *in camera* submissions to be made in connection with the claims. These documents provide the Court with the information necessary to make an informed determination of the claims which might not otherwise be available. These documents will, of course, be sealed and preserved in the Court's records in the event of appeal.

■ Initially, however, it must be determined whether the Saxbe affidavit and claim of privilege complies with the procedural requirements for assertion of the claim. As previously noted, the Saxbe claim indicates that the factual basis for the assertion of the privilege is purportedly set forth in the *in camera* affidavit of FBI Special Agent Robert F. Peterson. Citing *Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975), the plaintiff argues that this demonstrates that Saxbe's affidavit and claim of

privilege is defective for the reason that it fails to establish that Saxbe had personally considered the allegedly privileged material in the course of deciding that it contained military or state secrets. Alternatively, the plaintiff argues that Saxbe's affidavit and claim of privilege is defective on its face because it fails to set forth, with sufficient particularity, the factual basis for the privilege. The Court finds these contentions to be without merit.

In the *Kinoy* case, the district judge held that an analogous affidavit and claim of privilege of Attorney General Richardson failed to comply with the formal requisites for assertion of the claim because the affidavit failed to state that Richardson had personally considered the materials covered by the privilege in the course of deciding that it was a military or state secret. The district judge, in reviewing the Reynolds case, stated that "[a]t a minimum there must be an explicit representation to [that] effect" before the privilege could be properly invoked.[38]

In this case, however, Saxbe does explicitly state in his affidavit that "[t]he matters stated herein are based upon my knowledge; upon information available to me in my official capacity; and upon conclusions reached in accordance therewith." The fact that these "matters" have been submitted to the Court in the *in camera* affidavit of another governmental official does not mean that Saxbe had not personally considered the allegedly privileged material. The essential matter is that the executive officer claiming the privilege give careful consideration to the nature of the information withheld and its effect on national security.[39] The Saxbe affidavit and claim

---

**38.** Admittedly this is not a mere technical requirement. As the district judge in the *Kinoy* case explained:

> Because the Court must rely so heavily upon the judgment of the responsible executive officer in a case such as this, it must be clear that the judgment was properly exercised. *Kinoy v. Mitchell, supra*, at 9.

**39.** See Chief Justice Vinson's quotation from an English case in *Reynolds*:

> The essential matter is that the decision to object should be taken by the minister who is the political head of the department, and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced. . . ." *Duncan v. Cammell, Laird & Co.*, [1942] A.C. 624, 638. *United States v. Reynolds, supra*, 345 U.S. at p. 8, n. 20, 73 S.Ct. at p. 532.

488

of privilege explicitly states that this was done and the Court has no reason to believe otherwise.

Moreover, the fact that Saxbe has presented the Court with his reasons for invoking the privilege by the *in camera* submission of the Peterson affidavit does not mean that the claim must fail for lack of a factual basis. Saxbe states in his affidavit that the Peterson affidavit and the exhibits attached thereto sets forth, in an orderly fashion, the reasons for the FBI's investigation and its effect on national security. In addition, Saxbe also states that it would "prejudice" the national security to disclose the particular facts contained in that sealed document. Since the factual basis for Saxbe's formal claim of privilege has been represented to involve sensitive matters that are at the core of the privilege, the Court believes that it would be highly inappropriate to require the formal claim of privilege to disclose those matters prior to the Court's *in camera* inspection. Any other procedure might result in the disclosure of the very information the privilege was designed to protect; a possibility that Chief Justice Vinson in the *Reynold's* case admonished the courts' to avoid.[40]

The Court's examination of the Saxbe affidavit and claim of privilege reveals that it satisfactorily complies with the formal requisites for assertion of the claim as set forth in the *Reynolds* case. This formal claim of privilege was properly lodged by the head of the executive department having control over the matter, and was explicitly made upon the personal consideration of that officer. That person has also supplied the Court with the underlying documents for *in camera* inspection of the reasons for asserting the privilege. Under these circumstances, the Court finds that the Saxbe affidavit is adequate for purposes of invoking the claim of privilege.

While the Court in the course of conducting its *in camera* review has necessarily relied upon the sealed *in camera* submissions to a great extent, the most careful and cautious consideration has been given to those documents. The government, of course, has the burden of showing that the material in question is within the privileged category and that the circumstances are appropriate for the claim.[41] The question for the Court is whether the government's showing in support of its claim demonstrates to a reasonable possibility that disclosure of such information would reveal military or state secrets detrimental to national security interests. In resolving that question the Court has probed beyond the Saxbe affidavit and claim of privilege and has carefully scrutinized the factual basis for the national security interests posed in support of the privilege.

■ At the outset it must be noted that Saxbe's formal claim of privilege was filed on December 16, 1974. Although the affidavit and claim of privilege refers to national security matters as they existed as of that date, the claim of privilege must itself be viewed in light of the circumstances as they exist today. As the Fourth Circuit aptly explained in *United States v. Ahmad*, 499 F.2d 851, 855 (4 Cir. 1974):

> The passage of time has a profound effect upon such matters, and that which is of utmost sensitivity one day may fade into nothing more than interesting history within weeks or months. Any considerations of national security interests therefore must be viewed in the light of circumstances as they exist at the time the request for disclosure is made—not when the affidavit was prepared or the material filed with the court.

---

**40.** *United States v. Reynolds, supra*, at 8, 73 S.Ct. 528. It is significant also to note that the district judge in the *Kinoy* case recognized that in a case such as this the courts are competent and indeed required to make a judgment as to whether the material in question is a military or state secret and that "*Reynolds* does not require the court . . . ., to rely solely on the affidavit of the Attorney General," but may also consider the underlying *in camera* documents. *Kinoy v. Mitchell, supra*, at 10.

**41.** *See Kinoy v. Mitchell, supra*, at 8; citing *United States v. Reynolds, supra*, 345 U.S. at 8, 73 S.Ct. 528.

Moreover, it should also be noted that Saxbe's formal claim of privilege relates only to information concerning electronic surveillance of the plaintiff's conversations or communications concerning the plaintiff. To the extent that the "Notice of *In Camera* Submission" or the claim of privilege itself may suggest otherwise, the defendants have knowingly refrained from asserting the Saxbe claim of privilege with respect to other requested information.[42] This, of course, does not apply to the formal claims of privilege asserted by the Secretary of Defense. That privilege is referred to in the Saxbe affidavit and claim of privilege and it must stand or fall on its own basis.

■ Upon *in camera* examination of the documents submitted, the Court has balanced the interests of the parties in light of all the circumstances as they exist today and has determined that the Saxbe claim of privilege should be upheld. The Court is ultimately satisfied that the FBI electronic surveillances in question were authorized by the Attorney General at the time for purposes of obtaining information concerning a foreign-based international terrorist movement that continues to represent a clear and present danger to the national security. In each instance, the subject of the surveillance was an individual or organization, other than the plaintiff or the domestic organization to which he belongs, that has been identified with such foreign-based international terrorist movement. The plaintiff's conversations or communications concerning the plaintiff were intercepted by the FBI in the course of its surveillance of these other individuals or organizations.

In view of all the circumstances, the Court is satisfied that there is more than a reasonable possibility that disclosure of the information requested by the plaintiff would reveal sensitive governmental matters related to the national defense and the international relations of the United States. The government has therefore sustained its burden of demonstrating, with sufficient particularity, that the circumstances are appropriate for invoking Saxbe's formal claim of privilege. The information falling within that claim of privilege is absolutely protected from disclosure because there is a reasonable possibility that it would reveal a military or state secret.

Although the Court has found that the Saxbe claim of privilege should be sustained in this case so as to deny answers to some of plaintiff's interrogatories propounded to the defendants, the Court's inquiry in this matter has not ended. It still must be determined whether the warrantless electronic surveillances in this case comply with the commands of the Fourth Amendment. This inquiry raises complex constitutional questions relating to the President's lawful authority to conduct foreign intelligence surveillance and its resulting impact in the domestic area. The Court wishes to make it abundantly clear that the *in camera* review in this case has been conducted solely for the purposes of determining the discoverability of the information at issue, and the *in camera* submissions have not been received and inspected for the purpose of making any *ex parte* determination on the merits of this important question.

## B. THE SCHLESINGER–RUMSFELD–BROWN CLAIMS OF EXECUTIVE PRIVILEGE

On the date that the defendants filed the formal claim of privilege of then Attorney

---

**42.** The "Notice of the *in camera* submissions" underlying the Saxbe affidavit and claim of privilege states that the exhibits were submitted in opposition to the plaintiff's motion with respect to electronic surveillance "and also with respect to other privileged matters asserted by defendants in opposition to plaintiff's motion to compel discovery." Moreover, the Saxbe affidavit itself states that the Attorney General "reserve(d) the opportunity to submit a further Affidavit and Claim of Privilege in opposition to any disclosures to the plaintiff of the other information requested should it be necessary to do so following the Court's ruling on the objections which have been interposed by the defendants with respect thereto." Despite these representations, the defendants have not asserted a formal claim of privilege over these other matters. *See also* the Court's Memorandum Opinion, *Jabara v. Kelley, et al*, Civil No. 39065 (E.D.Mich. June 27, 1975) (unpublished opinion).

General Saxbe, they also submitted to the Court an *in camera* affidavit and claim of privilege of former Secretary of Defense James R. Schlesinger. As the Court has already noted, the Saxbe affidavit and claim of privilege specifically makes reference to the Schlesinger affidavit; stating that it has been submitted to the Court for purposes of asserting a formal claim of privilege in opposition to the disclosure of "documents and information relating to certain foreign national security electronic surveillances." Unlike the Saxbe affidavit and claim of privilege, the Schlesinger affidavit and claim of privilege has not been filed and made part of the Court's record. It has been submitted solely for the Court's *in camera* inspection.

The Schlesinger affidavit and claim of privilege has been asserted in response to the plaintiff's discovery attempts to obtain information and material relevant to certain warrantless interceptions of plaintiff's communications by a federal agency other than the FBI. The defendants have admitted in their answers to plaintiff's interrogatories that these warrantless interceptions have occurred and the FBI has received summaries of these interceptions from such agency; but, they have consistently refused to disclose the name of the "other federal agency" involved as well as the underlying materials in question on the ground of the Schlesinger claim of privilege.[43]

At the July 19, 1976, hearing on this motion, the defendants tendered to the Court the *in camera* affidavit and formal claim of privilege of former Secretary of Defense Donald H. Rumsfeld. At that hearing, the defendants stated that a search of the files of the other federal agency had just revealed that there were other intercepted communications pertaining to the plaintiff that were not specifically included in either the Schlesinger or Rumsfeld claim

of privilege. The defendants subsequently requested that the Court reserve judgment on plaintiff's motion to compel discovery to permit the government to file a supplemental affidavit to perfect their formal claims of privilege. This request was reluctantly granted because the Court was of the view that it could not adequately decide the discoverability of the information in issue without having all of the objections of the defendants before it.

On March 15, 1977, the defendants hand delivered to the Court the *in camera* affidavit and formal claim of privilege of the present Secretary of Defense, Harold Brown.[44] This sealed classified document was specifically submitted for purposes of supplementing the formal claims of privilege asserted by Schlesinger and Rumsfeld and to extend those claims to include the additional information previously discovered in the files of the other federal agency. The Court was also informed that the *in camera* affidavit of Secretary Brown more fully sets forth the factual basis for the government's claims of privilege.

As in the case of the thirteen (13) warrantless wiretaps instituted by the FBI, the defendants have contended that the warrantless interceptions of plaintiff's communications by this other federal agency were conducted pursuant to lawful national security intelligence for purposes of obtaining *foreign* intelligence information. In their response to plaintiff's interrogatories, the defendants have also stated that the FBI had requested the summaries of plaintiff's communications from the other agency "to obtain information on an individual reported to be an agent of or acting in collaboration with a foreign power," and that this information was used by the FBI for investigative purposes.[45]

To the extent that the defendants have admitted that they have received and used

---

43. Defense's Response to Plaintiff's Third Supplemental Interrogatories, dated February 6, 1976, 19(a)–(g), 21(a)–(c), 22.

44. According to the defendants, the delay in submitting this document was caused by the change in the administration at Washington.

45. Defendant's Response to Plaintiff's Third Supplemental Interrogatories, dated February 6, 1976, 21(a) and (c).

information pertaining to the warrantless interception of plaintiff's communications by another federal agency, the plaintiff would at least have a need to know the factual basis upon which the defendants have concluded that this information was obtained and used in the course of lawful national security surveillances involving foreign agents or powers. Moreover, since it is the method and extent of the government's investigation of the plaintiff that gives rise to the allegations contained in plaintiff's amended complaint, the plaintiff would also need to know at least some of factual detail of the manner in which this other federal agency has intercepted his personal communications and the uses to which that information was put. The nature and manner of the information that was obtained and used in the government's investigation of the plaintiff would be relevant and material to the issues in this case. The plaintiff has requested some of this information by the interrogatories at issue in this motion and the defendants have refused to comply with those requests on the basis of the claim of privilege of the Secretary of Defense.

■ The plaintiff contends, however, that the *in camera* affidavits of the present and former Secretaries of Defense are totally defective for purposes of asserting a formal claim of privilege in opposition to the pending discovery requests because those affidavits have never been filed, but instead have been merely proffered to the Court, *ex parte*. It is argued that unless and until these affidavits are filed and made part of the public record, the Court should not even consider the matters contained therein in the course of determining the discoverability of the requested information. The Court disagrees.

While the Court would have preferred that the Secretary of Defense had filed an affidavit for purposes of asserting its claim of privilege and had submitted the factual basis for such claim by way of a sealed *in camera* document, as in the case of Saxbe claim of privilege, the Court cannot say that such a procedure is the *only* effective way for asserting these formal claims of privilege. This is particularly true with these claims since they are clearly an attempt to assert the military or state secrets' privilege.

Insofar as military or state secrets are concerned, the Supreme Court in the *Reynolds* case makes it clear that it is the court itself that must determine whether the circumstances are appropriate for the claim of privilege. That determination, of course, must be made without disclosing the material underlying the claim. While the *Reynolds* case requires a "formal" claim to be lodged by the head of the department which has control over the matter, that decision did not specify any particular technical requirement with respect to the manner in which the "formal" claim is asserted. Analogous cases that have considered the *Reynolds* case are equally silent on this point.[46]

The essential procedural requirement for invoking these claims of privilege under the *Reynolds* case is that there must be a formal claim made by the head of the department or agency having control over the matter, after personal consideration by that officer. The Court believes that it is competent and indeed required to make that determination *in camera* in view of the special circumstances of this case. The Court assures the plaintiff that these *in camera* submissions have not been received and inspected for purposes of making any *ex parte* determination on the merits of the case. These documents will also be sealed and preserved in the Court's records in the event of appeal.

The Court finds that an *in camera* inspection of the formal claim of privilege of Secretary Brown, and the claims it supplements, is warranted on the basis of plaintiff's demonstrated need for some of the information he has requested and because

**46.** *See e. g., Kinoy v. Mitchell, supra; United States v. Ahmad, supra; Carter v. Carlson*, 56 F.R.D. 9, 10 (D.D.C.1972); *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena*, 40 F.R.D. 318, 326 (D.D.C.1966).

there is a lack of alternative sources for obtaining that information. Upon *in camera* examination, the Court also finds that the *in camera* affidavit and claim of privilege of Secretary Brown, and former Secretaries Schlesinger and Rumsfeld, sufficiently comply with the procedural requirements for the assertion of the claim as set forth in the *Reynolds* case. These formal claims of privilege specifically state that the matters stated therein were based upon the personal knowledge and consideration of the Secretary of Defense having official custody and control of such matters. These claims were therefore properly lodged by the head of the executive department having control over the matter, and were explicitly made upon personal consideration of that officer.

▆▆▆ In considering all the circumstances as they exist today, the Court has further determined that the claim of executive privilege asserted by the Secretary of Defense should be upheld. The Court is ultimately satisfied that the information and material pertaining to the interception of plaintiff's communications by the unnamed federal agency would directly affect matters of continuing military and diplomatic secrecy. The Court is satisfied that there is at least a reasonable possibility that the disclosure of the reports and summaries of those communications as well as their nature or mode and the means by which they were obtained would compromise a highly valuable source of foreign intelligence with serious adverse consequences to the capability of the President to conduct foreign affairs and to carry out his national defense responsibilities.

In *C & S Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), the Supreme Court, in discussing the President's authority to conduct foreign affairs, stated:

> The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought

not to be published to the world. It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.

This very language was again quoted with approval by the Supreme Court in *United States v. Nixon*, 418 U.S. 688, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973). In the *Nixon* case, Chief Justice Burger, in distinguishing Mr. Nixon's purported claim of executive privilege (which was unanimously rejected), stated that the utmost deference has always been given to the President's Article II duties and responsibilities over military and diplomatic matters. This Court believes that the same consideration must be given to the formal claim of privilege lodged by Secretary of Defense Brown and his immediate predecessors.

Since the Court's *in camera* inspection of the claim of privilege lodged by the Secretary of Defense demonstrates that there is a reasonable possibility that at least some information and material requested by the plaintiff would reveal a military or state secret, these matters are found to be absolutely protected from disclosure. The government has thus sustained its burden of demonstrating, with sufficient particularity, that the circumstances are appropriate for invoking the privilege.

▆▆▆ Although the Court has found that the circumstances are appropriate for invoking the privilege, there is no basis for extending the privilege to matters not clearly within its scope.[47] The privilege that the Court has upheld only extends to reports and summaries of intercepted communications, their nature or mode, the means by which they were obtained, and other relevant information and material that would reasonably tend to reveal foreign intelligence sources and capabilities. This privilege does not extend to relevant factual information pertaining to the "arrangement" by which the FBI had request-

---

**47.** To be within the scope of the privilege, it must be demonstrated that the material is clearly within the privileged category. *See, e.*

*g., Kinoy v. Mitchell, supra,* at 8; *International Paper Co. v. Fiberboard Corp.,* 63 F.R.D. 88, 94 (D.Del.1974).

ed and obtained information about the plaintiff from the unnamed federal agency, nor the "general" manner such information was ultimately used by the FBI.

Moreover, the privilege the Court has upheld does not protect from disclosure the name of the "other federal agency" that has admittedly intercepted plaintiff's personal communications without prior court approval. The name of this other federal agency has been revealed in a final report of the United States Senate Select Committee on Intelligence issued on April 23, 1976.[48] In view of that report, it would be a farce to conclude that the name of this other federal agency remains a military or state secret. The plaintiff at least has a right to know the name of the federal agencies that have admittedly engaged in the warrantless surveillances of his personal communications and affairs.

The Court also wishes to make it clear that its *in camera* review has not revealed any evidence to establish that the plaintiff or the domestic organization to which he belongs has been implicated in any way with a foreign agent or organization of or acting in collaboration with a foreign power. The plaintiff's communications or communications concerning the plaintiff were intercepted by the unnamed federal agency in the course of gathering foreign intelligence information of other matters.

Although the Court has found that the claim of privilege of the Secretary of Defense should be sustained, the Court's inquiry into this matter has also not ended. As in the case of the thirteen (13) FBI warrantless wiretaps, the Court must still determine whether the warrantless surveillances of this other unnamed federal agency and the use to which they were put

comply with the commands of the Fourth Amendment. This inquiry raises the same complex constitutional questions the Court has already noted with respect to ruling on the Saxbe claim of privilege.

### III.

The other claims of executive privilege asserted by the defendants in opposition to plaintiff's pending discovery requests fall within various recognized claims of qualified privilege. Since the Court has considered these same claims in ruling on plaintiff's prior discovery motions, only brief mention will be given to these claims. The Court wishes to make it clear, however, that it has carefully reconsidered each of these claims in ruling on this motion.

The defendants have refused to disclose certain information requested by the plaintiff on the ground that this information pertains to an ongoing criminal investigation. The information in question relates to relevant factual matters concerning the defendants' investigation of the plaintiff.

■ It is well established that the government has a qualified privilege to prevent public disclosure of investigative files and related material prepared in the course of an ongoing criminal investigation.[49] As the court in *Black v. Sheraton Corp. of America*, 50 F.R.D. 130, 133 (D.D.C.1970) explained: "[t]he results of investigations of alleged criminal activity are by their nature the type of information that the public interest requires be kept secret." To invoke the privilege, however, it must be established that the materials at issue relate to a *bona fide*, ongoing, law enforcement investigation.[50] Moreover, in *Swanner v. United States*, 406 F.2d 716, 719 (5th

---

48. *See Senate Select Comm. to Study Governmental Operations with respect to Intelligence Activities, Supplemental Detailed Staff Reports on Intelligence Activities and the Rights of Americans, Book III*, S.Rep. No. 94–755, 94th Cong., 2nd Session (1976).

49. *See, e. g., Kinoy v. Mitchell, supra*, at 12; *Bristol-Myers Co. v. FTC*, 138 U.S.App.D.C. 22, 424 F.2d 935 (1970); *Black v. Sheraton Corp. of America*, 50 F.R.D. 130 (D.D.C.1970); *Capitol*

*Vending Co., Inc. v. Baker*, 35 F.R.D. 510 (D.D.C.1964).

50. *See, e. g., Bristol-Myers Co. v. FTC, supra*. Although *Bristol-Myers* was decided under the Freedom of Information Act, the case is still relevant because at the time it was decided law enforcement files pertaining to an ongoing criminal investigation were obtainable under the Act only "to the extent available by law," 5 U.S.C. § 552(b)(7) (1970).

Cir. 1969), the Fifth Circuit has noted that "while pendency of a criminal investigation is a reason for denying a discovery of investigation reports, this privilege would not apply indefinitely . . . ."

 In ruling on prior discovery motions in this case, the Court has indicated that it would not order the disclosure of information that would have the effect of compromising ongoing federal criminal investigations or jeopardize current investigatory techniques. The plaintiff, however, contends that the defendants' claim of privilege based upon an ongoing criminal investigation has been insufficiently established at least to the extent that the claim has been asserted in reference to inquiries seeking to know whether or not the *plaintiff* is the subject of such investigation. The Court agrees.

In responding to a prior interrogatory, pursuant to the Court's Order of March 21, 1974, the defendants unequivocally denied that the "defendants' investigation of the plaintiff [was] an ongoing investigation of criminal activity." In their answer to plaintiff's amended complaint, the defendants appeared to change their position on this point by stating that the information that they had obtained concerning the plaintiff was "collected pursuant to a criminal investigation." Moreover, in responding to the set of interrogatories at issue, the defendants have stated that the "criminal aspect" of the investigation referred to in their answer "began on July 1, 1973 and is an ongoing criminal investigation." [51] Although the defendants have denied that their investigation of the plaintiff was initiated to investigate a specific crime, they have nevertheless refused to respond to interrogatories that seek relevant factual information to substantiate whether the plaintiff is a subject of an ongoing criminal investigation.[52]

The Court finds that the defendants' answers and admissions with respect to plaintiff's status in the defendants' alleged ongoing criminal investigation are evasive and misleading. The plaintiff at least has a right to know whether the defendants are specifically *claiming* that he is in fact the subject of an ongoing criminal investigation which may implicate him in some crime. Moreover, there is no basis for the Court to conclude that the defendants' claim of an ongoing criminal investigation has been reasonably established to bring into operation the privilege that would block the disclosure of factual information relevant to plaintiff's relationship to defendants' investigation. The defendants have thus failed to establish that the plaintiff is involved in a *bona fide*, ongoing, law enforcement investigation that may implicate him in some crime.

 Finally, although the defendants have stated that the criminal aspect of their investigation began on July 1, 1973, there has been no claim that the defendants intend to use the information they have obtained in any criminal prosecutions. The Court reminds the defendants that claims of privilege based upon ongoing criminal investigations do not apply indefinitely. After the expiration of a reasonable period of time, the privilege is lost.[53] To the extent that the defendants persist in claiming this privilege to deny the plaintiff factual information that would substantiate whether or not he is a subject of an ongoing criminal investigation, the Court would, of course, have to determine whether the privilege has been lost due to the passage of time.

 The defendants have also refused to disclose certain information on the ground that such information involves privileged policy matters. In ruling on prior discovery motions, the Court has distinguished between discovery requests seeking factual data as opposed to material of a

---

**51.** Defendants' response, *in part*, to Plaintiff's Third Supplemental Interrogatories, dated February 6, 1976, 3(e).

**52.** *Id.*, 3(e), 31.

**53.** *See, e. g., Swanner v. United States, supra; Brown v. Thompson*, 430 F.2d 1214, 1215 (5th Cir. 1970); *Kinoy v. Mitchell, supra*, at 12.

policy discussion nature. While relevant factual data may be discovered, policy information will rarely be ordered discovered.[54] Policy information includes the reasons for taking certain actions, the decision making process, and intra-governmental memoranda and evaluative reports and the like. The Court continues to adhere to these established principles. While this privilege will be recognized, disclosure will be ordered if the balancing process reveals that the plaintiff's interest should predominate. This, of course, is always the case with qualified privileges.

◾ The Court has previously indicated that it will not order the disclosure of any information which would reveal, or tend to reveal, the identity of an informer. The same applies to persons, not technically informers, who have volunteered information to the government. The Court has applied this consideration to the pending discovery requests.

◾ Finally, the Court has also previously decided that the liability and damage issues in this case will be tried separately. Thus, any requested information which is relevant only to damages or other forms of relief will not be ordered at this time. In the event the plaintiff establishes liability, discovery will be reopened on the issue of possible relief.

### IV.

Turning now to the specific interrogatories at issue, the Court makes the following disposition:

3. *With respect to the Eighth Defense (as amended) of the Answer to First Amended Complaint by Defendants Levi, Kelley, Welch and Churchill [hereinafter "Answer"]:*

(d) *If the answer to Interrogatory 3(c) is no, state the reason for beginning the investigation or collection of information concerning the plaintiff, including any incidents or information upon which the defendants were relying to justify their actions.*

(e) *If the answer to Interrogatory 3(c) is no, state when the "criminal" aspect of the investigation referred to in Answer, Paragraph 10 (as amended) began and ended, and set forth the information upon which the defendants were relying to justify this aspect of their actions.*

Balancing the interests in this case, the government need not answer 3(d) on the ground that it seeks policy as distinguished from factual information. The government shall answer 3(e) by disclosing the factual information, if any, pertaining to plaintiff's relationship to defendants' investigation.

10. *State whether the defendants, their agents or employees have disseminated information concerning the plaintiff to agencies or persons outside of the federal government, including but not limited to the Detroit Police Department. If so, please identify the substance of all such information, including any document by which it was disseminated, and provide the date(s) on which such dissemination occurred.*

The defendants have answered 10, in part, but have objected to revealing "the substance of all such information, including any document by which it was disseminated, and . . . the date(s) on which such dissemination occurred . . . ." The plaintiff's principal reason for requesting this information is to obtain information to help him correlate certain documents previously produced by the defendants. In view of the interests involved, the Court finds that the plaintiff has failed to demonstrate a need for this information. The government need not answer.

13. *If the answer to Interrogatory 12 is yes:*

(a) *identify with respect to each interception, the foreign power(s) involved; and*

(b) *set forth the factual basis upon which defendants or their agents deter-*

---

**54.** *See, e. g., Wood v. Breier, supra.*

mined that each such person or organization was in fact the agent of such foreign power.

The government need not answer 13(a) and (b). This information is absolutely privileged under the Saxbe claim of privilege for the reasons stated in Part II B of this opinion.

14. With respect to defendants' response to Interrogatory 5(b), filed on May 10, 1974, was each intercepted communication originated by a person other than the plaintiff from a place other than plaintiff's home or business premises?

The government answered 14 in the affirmative as to all communications overheard through FBI wiretaps but refused to answer as to the communications intercepted by the unnamed federal agency on the basis of the claim of privilege of the Secretary of Defense.

This interrogatory only calls for a yes or no answer. The government shall answer.

17. With respect to the "internal communications," dated November 13, 1972 and April 11, 1974 and referred to in Paragraph 19 of the Answer:

(a) What was the authority for the decision to send the instructions contained in these communications? Please set forth the substance and date of adoption of any applicable FBI policy;

(b) What was the factual basis for giving these instructions with respect to plaintiff's communications?

(c) Who gave the instructions?

The government answered 17(a), (b) and (c), in part, by stating that these instructions were issued by Bureau Headquarters on the basis of its own authority. The balance of this interrogatory seeks information relevant to the question of Tap Minimization that relates, if at all, to the question of damages. The government need not answer at this time.

19. With respect to the "six communications to or from plaintiff . . . obtained by another Federal Agen-

cy," of which defendants admit they have received summaries [Answer, Paragraph 17], please state:

(a) the name of the agency in question;

(b) the date and reason the FBI requested "any available information concerning plaintiff which might come into the possession of that agency" [Answer, Paragraph 19];

(c) the text of the FBI request;

(d) the nature of the "lawful national security intelligence investigation" by the FBI which led to this request;

(f) the dates on which the summaries of plaintiff's intercepted communications were received by the FBI; and

(g) the nature or mode of the plaintiff's intercepted communications and means of their interception.

For the reason stated in Part II B of this opinion pertaining to the claim of privilege of the Secretary of Defense, the government need not answer 19(c), (d) and (g). For the same reasons, the government shall answer 19(a) and (f). The government has answered 19(b) by giving the date; the government need not give the reasons for its request on the ground that such information may reveal policy matters.

21. With respect to each oral communication of plaintiff which defendants have received or obtained in summary form from another Federal agency, state:

(a) whether defendants are asserting that each such interception was made during surveillance of a person who, or an organization which, was in fact the agent of a foreign power at the time each such interception occurred;

(b) the date, time and place each such interception occurred;

(c) whether the summaries of plaintiff's intercepted conversations have been used by defendants or their agents for investigative or other purposes, and if so, please describe in what manner they have been used;

The government's answer to 21(a) is substantially responsive; the government need not answer further as to 21(a). The government need not answer 21(b) for the reasons stated in Part II B of this opinion pertaining to the claim of privilege of the Secretary of Defense. The government shall answer 21(c) as to factual information only.

22. With respect to the Answer, Paragraph 18, please identify and describe in detail "the arrangement under which the Bureau received summaries" of plaintiff's intercepted communications from another Federal agency, including any documents pertaining to the authority and procedure for this "arrangement," including its termination by former Attorney General Richardson on October 1, 1973.

The government shall answer.

31. Please explain what plaintiff's status was with respect to the criminal investigation referred to in Answer, Paragraph 32.

The government shall answer.

39. Please identify

(a) the foreign government to which the defendants supplied information concerning the plaintiff;

(b) the information supplied; and

(c) the date(s) the information was supplied.

The government need not answer.

40. Please define and identify "matters of concern to that country" [Answer, Paragraph 30].

The government's answer is substantially responsive and it need not answer further.

IT IS SO ORDERED.