**AMERICAN CIVIL LIBERTIES UNION et al., Plaintiffs-Appellees,**

v.

**Harold BROWN, Secretary of Defense, et al., Defendants-Appellants.**

No. 78–1906.

United States Court of Appeals, Seventh Circuit.

Reheard En Banc Dec. 3, 1979.

Decided April 11, 1980.

Eloise E. Davies, Civil Division, Dept. of Justice, Washington, D. C., for defendants-appellants.

Joseph R. Lundy, Chicago, Ill., for plaintiffs-appellees.

**1172**

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER and CUDAHY, Circuit Judges.*

CUMMINGS, Circuit Judge.

In this lawsuit plaintiffs are seeking redress for alleged violations of their constitutional rights stemming from the defendants' investigations and intelligence-gathering activities aimed at the plaintiffs and the classes they represent.[1] Last June a unanimous panel of this Court reversed the district court and held that the federal defendants (the Government) need not answer two of plaintiffs' interrogatories regarding an informant's identity and the Counter-Intelligence Research Files System. 609 F.2d 277. The Court divided, however, on the question whether defendants need answer an interrogatory that in effect requested certain Army Regulations and a Field Manual relating to domestic intelligence activities and techniques in use from 1966 through 1976.[2] Bypassing the Government's argument that the materials constituted state secrets absolutely protected under *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, the panel majority held that the documents fell within the exception in the Freedom of Information Act (FOIA) for investigative materials (5 U.S.C. § 552(b)(7)(E)),[3] and thus that the district court erred in directing their disclosure. The partially dissenting judge, on the other hand, found the FOIA provision inapplicable and, after reviewing the materials

*in camera*, agreed with Judge Kirkland that no state secrets were involved. The dissent relied in part on the Government's assertion that all military domestic intelligence ceased in 1971 and noted that the trial court's protective order would in any event keep the materials from public view. 609 F.2d at 284–285.

On July 31, 1979, we granted a rehearing *en banc* limited to the question whether the Army Regulations and Field Manual were producible. The case was reargued on December 3, 1979. We now vacate that part of the district court's order requiring production of the documents so that Judge McMillen, who is now in charge of the case,[4] may determine after hearing from counsel for the parties whether there is sufficient need for this material to warrant close scrutiny of the Government's claim of privilege, what parts, if any, of the material should ultimately be disclosed, and whether any alterations should be made in the protective order.

The Government has stated that it believes the requested materials pertain to the "claims of allegedly illegal domestic intelligence activities" (Br. 31) and has not taken issue with a reading of the district court's opinion that would hold the documents relevant (Br. 26).[5] Indeed, at the oral argument before the panel, Government counsel upon questioning reaffirmed the Government's belief that the material is relevant. The Government's rigid response is that the state secrets privilege applies to

---

* Circuit Judges Tone, Bauer and Wood disqualified themselves from any consideration of this case.

1. We upheld the certification of classes in *Alliance to End Repression v. Rochford*, 565 F.2d 975 (7th Cir. 1977).

2. The four *in camera* documents are Army Regulations 381–12, 381–12–1, and 381–47, bearing dates from October 1974 to April 1976, and Army Field Manual 30–17A, dated February 1973. The Government acknowledges that the regulations were modified in 1971 to curtail domestic intelligence operations (Response to petition for rehearing pp. 10–11 n.9).

3. In response to plaintiffs' petition for rehearing *en banc*, the Government disavowed any

reliance on 5 U.S.C. § 552(b)(7)(E) and urged that the panel's majority opinion be revised in order to decide the case "under the law applicable to the state secret privilege" (Response to petition for rehearing, p. 12).

4. Judge Kirkland, who had this case through the time when it was argued before the panel, has since retired. The case has been reassigned to Judge McMillen.

5. Of course under the civil discovery rules, the documents need only be "reasonably calculated to lead to the discovery of admissible evidence" (Rules 26(b)(1) and 34(a)(1) of the Federal Rules of Civil Procedure).

these materials and that regardless of relevance they may not be disclosed. As the basis of its position, the Government relies on an affidavit filed below by the Secretary of the Army invoking the state secrets privilege and asserts that, after giving this affidavit due deference, the district judge was required to hold that "the privilege is absolute" (Br. 12).

Since the teaching of *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, is to the contrary, we cannot accept the Government's position. In *Reynolds*, the Supreme Court did find that a formal claim of privilege would prevail if the trial court were ultimately satisfied that military secrets were at stake. But it also held that claim of the privilege should not be lightly accepted where there is a strong showing of need by the requesting party. Moreover, although the Court stated that the trial court should consider all the available alternatives in assessing a party's need for the material, it directed the district court to accord the claim of privilege correspondingly close consideration as the party requesting disclosure carries its burden of showing need.

As Judge Kirkland rightly concluded below, a party's showing of need often compels the district court to conduct an *in camera* review of documents allegedly covered by the privilege in order to determine whether the records are properly classified "secret" by the Government. Any other rule would permit the Government to classify documents just to avoid their production even though there is need for their production and no true need for secrecy. As stated in *Reynolds, supra* at 9–10, 73 S.Ct. at 533 "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." Moreover, judicial scrutiny of government domestic security claims is particularly appropriate. See *United States v. United States District Court*, 407 U.S. 297, 320, 92 S.Ct. 2125, 2138, 32 L.Ed.2d 752; *Ray v. Turner*, 587 F.2d 1187, 1194–1195 (D.C. Cir. 1978).

Judge Kirkland originally found that plaintiffs sufficiently showed a need to secure the desired information because the "military defendants' records are the only source of evidence which would establish the exact nature of domestic intelligence activities so that this Court might determine whether these activities were lawful" (Government App. 74). Since Judge Kirkland is no longer to try this case, however, we think that Judge McMillen should satisfy himself that plaintiffs have sufficiently shown a need for production. In resolving this question, Judge McMillen should consider all options available to plaintiffs, including any alternative methods of discovery such as the depositions suggested in *Reynolds*, 345 U.S. at 11, 73 S.Ct. at 533.

Significantly, our preliminary *in camera* examination of the material causes us to conclude that the existence of state or military secrets therein is sufficiently dubious that the formal claim of privilege may not prevail if Judge McMillen determines that the material is needed by plaintiffs. But Judge McMillen's inquiry should not end there. Substantial portions of the material seem so remotely related to plaintiff's claim as to raise questions whether the Government's interest in protecting this material should be swept away. Thus without disclosing to plaintiffs' counsel the text of the documents in question, Judge McMillen should determine in colloquy with counsel for the parties (perhaps in chambers) whether any individual portions of documents (or the documents as a whole) are not reasonably calculated to lead to the discovery of admissible evidence and therefore are not producible under Rule 34. Finally, Judge McMillen should decide whether Judge Kirkland's protective order of October 14, 1976, should be broadened in order to safeguard any of the materials that are ultimately made available to the parties.[6]

The Government relies on *Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978), in part to suggest that the materials must be protect-

---

**6.** The protective order is reproduced in the Appendix to the panel opinion. 609 F.2d at 285–

286. Plaintiffs have indicated their willingness to abide by further restrictions.

ed because the procedures described by the Regulations at issue also applied to foreign intelligence conducted both in this country and abroad. The thrust of this assertion is that it may not be completely possible to segregate any information that is useful for purely domestic surveillance from foreign intelligence material that is not. This argument is better directed to the district court and Judge McMillen can properly consider such matters in following the directives of this Court. We note, however, that our own review of the material indicates that *Halkin* is no bar to disclosure of the documents once need and usefulness are shown. The documents at issue here, unlike those in *Halkin*, do not strictly concern past and ongoing foreign intelligence gathering. Nor do these documents appear to involve more than very general intelligence techniques. They are unlikely to reveal to any foreign power the fact that surveillance of its activities has occurred, the targets and the extent of such surveillance, or the means by which it was accomplished, and therefore require no protection on that basis.

After the *en banc* argument, the Government sent the Court copies of the opinion in *Hayden v. National Security Agency*, 608 F.2d 1381 (D.C. Cir. 1979). That case concerned the procedure for determining whether requested documents fall within two exemptions of the Freedom of Information Act and is not germane in view of the Government's disavowal of any reliance on that statute (see note 3 *supra*). Furthermore, the procedures we direct for the remand are consonant with the spirit of *Hayden*.

Insofar as the district court's order of March 28, 1978, requires production of the Army Regulations and the Field Manual it is vacated and the cause is remanded for further proceedings consistent herewith.

PELL, Circuit Judge, dissenting, in which SPRECHER, Circuit Judge, joins.

By sending this case back for further proceedings at the district court on the matter of the Army Regulations and Manual, it appears to me that this court, as did the district court judge to whom the case was originally assigned, is ignoring the clear mandate of *United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953), that when "from all the circumstances of the case, . . . there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged . . . the occasion for the [state secret] privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." I therefore respectfully dissent.

This is not a case which brings into play a subjective reaction, held by some, that Governmental authorities tend to overclassify documents. The record in this case contains far more than merely a formal assertion of "confidential" or "secret." Nor is there any reasonable basis to characterize the detailed affidavits in this case as reflecting "the caprice of executive officers."

The affidavit of Clifford L. Alexander, Jr., the Secretary of the Army of the United States, dated June 27, 1977, reads in part as follows:

The cited regulations and manual describe in detail the objectives, policies, procedures, and controls in the area of authorized counterintelligence and security activities. They discuss the selection and training of personnel involved in such activities, and describe particular types of operational techniques to be used in particular situations. Army Regulations 381–47 and 381–12–1 are regulatory guidance for such activities. Field Manual 30–17A contains applicable Army doctrine and explains the methods of operations.

The disclosure of the classified portions of these documents could compromise ongoing and future counterintelligence investigations, and could enable hostile intelligence agents to determine the identity and actions of Army counterintelli-

gence personnel. Most counterintelligence investigations are conducted in order to protect from disclosure, often to hostile foreign agents, information properly classified in the interest of national security. By learning the process by which counterintelligence operations are conducted it is possible in many cases to detect or frustrate them. Since the documents further explain the methods by which Army counterintelligence personnel avoid disclosing their identities, public release could seriously jeopardize the safety and effectiveness of counterintelligence agents who are in vulnerable positions. Perhaps most importantly, the techniques and procedures set forth in the documents are in many respects similar to procedures used in the collection of foreign intelligence information. Release of the documents could therefore enable persons to identify and frustrate Army foreign intelligence collection efforts, and thereby reduce the ability of the United States to acquire information necessary to preserve the national security. Release would also increase the possibility that Army collection efforts would be fed erroneous information by foreign agents.

For these reasons, I believe that disclosure of the classified portions of these three documents would critically injure the Department of the Army's foreign intelligence gathering functions and imperil sensitive, properly authorized counterintelligence and security activities. I therefore assert privilege over them. Unclassified portions of the documents will be provided to the plaintiffs.

The affidavit of Major General Harold R. Aaron, the Assistant Chief of Staff for Intelligence, Headquarters, Department of the Army, reads in part as follows:

5. I am familiar with those publications. The substantive portions of each are classified under the provisions of Executive Order 11652 and Department of Defense Directive 5200.1–R which protect national security information against unauthorized disclosure. The classified information contained therein has not been the subject of any official United States

Government release. The classifications cited reflect and are derived from classifications assigned to similar publications in other agencies at the highest levels of the United States intelligence community. It is my opinion that disclosure of that classified information would seriously damage and hinder the execution of the Army's properly authorized counterintelligence mission for which I am responsible. I therefore believe that the Army's fullest efforts must be exerted to protect it.

6. In my view, disclosure of this material would have the following specific adverse and irreparable effects upon Army intelligence and upon the intelligence community as a whole:

a. Operational techniques and procedures pertaining to sensitive sources and methods utilized in current, properly authorized operations serving the United States national interest worldwide would be compromised. As the targets of those operations study the "working model" of United States operations so provided, compromise or neutralization of specific operations is foreseeable. In the event of such compromise or neutralization, sources and United States intelligence personnel involved in those operations would be endangered.

b. Future operational opportunities will likely be lost, as legitimate targets reassess areas known to be of United States operational interest. Further, given the increased threat of compromise, persons who provide or could provide authorized, sensitive information under the protection of confidentiality would see their personal security jeopardized and cease providing, or refuse to provide their services.

c. Because techniques utilized in United States protective operations would be available for study by countries whose interests are inimical to the U.S., the susceptibility of United States intelligence agencies, and other United States Government organizations, to

hostile penetration would be increased. Similarly, their vulnerability to sabotage would increase.

d. Professional relationships with counterpart-services of friendly nations would be degraded. Disclosure of United States operational doctrine which the United States intelligence community has considered sensitive would surely undermine the mutual trust and confidence upon which those relationships are founded. My view in this regard is based upon personal meetings and · discussions with the chiefs of foreign counterpart services. The loss of confidence to which I refer could well have impact upon other official governmental relationships outside the intelligence community.

Judge Kirkland apparently being unimpressed by these affidavits, a further affidavit was filed, being that of Walter B. LaBerge, Acting Secretary of the Army of the United States. This affidavit, dated October 14, 1977, reads in part as follows:

4. The primary purpose of the attached publications is to provide definitive instructions, procedures, and guidelines in planning U.S. Army Counterintelligence operations against hostile foreign intelligence activities. Specifically, these operations involve sources and infiltrators and apply to counterintelligence activities worldwide. The general methods of using sources and infiltrators as outlined in these publications would be applicable to the conduct of Army agents described in paragraphs 1, 4, 5, and 9 of the Army Answer to Interrogatory 36(a).

5. Field Manual 30–17A:

a. The unclassified portions of this Manual describe the activities of individuals and hostile intelligence agencies against which counterintelligence operations must defend. The classified portions of this manual protect vital U.S. Army counterintelligence capabilities and methods of operations. Instructions, procedures, and guidelines are listed and explained. If a hostile intelligence agency knows our capabilities, it will also know how to defeat them.

b. In addition to protection of counterintelligence capabilities, the classified portions of this manual protect:

1. Operational techniques used in the ongoing U.S. Army foreign intelligence collection effort;

2. Techniques and procedures used throughout the United States intelligence community;

3. United States relationships with friendly foreign intelligence services.

6. Army Regulation 381–47:

a. Generally, the classified portions of this regulation protect the description of the goals, administration, and control of the Offensive Counterintelligence Operations (OFCO) conducted by the U.S. Army. OFCO is defined at paragraph 4e, AR 381–47. Because the definition and nature of OFCO operations are classified in the interest of national security, they are not repeated in this unclassified affidavit.

b. Specifically, the classified portions of this regulation set forth the goals, sensitive operational methods and opportunities, and organizational and functional outlines of OFCO which are of special interest to and receive special emphasis by the U.S. Army.

7. Army Regulation 381–12–1. This classified regulation contains instructions to Army counterintelligence personnel concerning the processing of incidents of subversion and espionage directed against the Army. Instructions to Army personnel on the reporting of such incidents are contained in Army Regulation 381–12 (copy attached to AR 381–12–1). The purpose of this brief regulation is classified in the interests of national security and is not repeated in this unclassified affidavit. A general statement of the purpose is contained in paragraph 1 of the regulation.

8. Disclosure of the classified portions of these publications not known to the public which describe techniques and procedures given special emphasis by the U.S. Army would seriously undermine

U.S. Army foreign intelligence capabilities and the national security interests of the United States.

As a judge, I cannot take upon myself the power of apperception in the sensitive area of intelligence and counterintelligence in the world of today to say that these specific claims of privilege are not sufficient to invoke the absolute state secret privilege. Implicitly, the majority opinion indicates that no strong showing of necessity has been made by the plaintiffs, which if it had been, under *Reynolds*, 345 U.S. at 11, 73 S.Ct. at 533, the claim of privilege should not be lightly accepted. But also, under the guidelines laid down by that case, "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id.* Here, it seems to me, this court has failed to accord sufficient deference, and certainly not the "utmost deference," to executive assertions of privilege upon the grounds of military secrets. *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

I recognize that some of the affidavits quoted above speak in terms of what "could" happen, not what is absolutely bound to follow if the present documents are required to be produced. That is a necessary approach because the protective order might prevent the documents from falling into improper hands. But, on the other hand, the protective order might well not carry out its function. "Protective orders cannot prevent inadvertent disclosure nor reduce the damage to the security of the nation which may result." *Halkins v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978). In any event, the state secrets concept when applicable is absolute, and I am unaware of any case in which a protective order has been considered adequate where similarly sensitive documents are involved. Here, the areas of possible danger sufficiently, in my opinion, justify invoking the full protection of the state secrets privilege.

Counsel for the Government at the en banc argument candidly conceded that the documents in question were not shocking state secrets. As she aptly pointed out, however, the great danger is in putting all of these procedures together and thereby laying down a blueprint for hostile intelligence forces. By knowing exactly how our intelligence and counterintelligence agents operate and in what areas they are concentrating, hostile forces can predict from the omissions in the procedures the areas in which our agents are not concentrating and where we might be vulnerable.

Also, counsel pointed out that the Manual contains a number of definitions which would tell any person improperly having access to the Manual what those designations mean with respect to Army intelligence. The danger, counsel continued, lies in the mere possibility of the documents falling into the hands of foreign agents which would compromise the matters in the documents without the Army even being aware that they had been compromised. The Army thereby would be unable to take its own protective steps.

Finally, in considering the disposition of the present appeal, I cannot be unmindful, as none of us should be, of the troubled state of the relationships between the nations of the world today, and the urgent necessity that this country should remain knowledgeably aware, not only of the ostensible aims, purposes, and objectives of other nations and political forces therein, but also of their actual aims, purposes, and objectives.

This past year or so is a period of time when one United States Ambassador has been kidnapped and killed, an embassy in another country has been overrun by militants who seized American diplomatic personnel as hostages, and still another embassy was attacked and burned with two deaths occurring. Only the historians will probably have the perspective to say whether these happenings could have been averted, or at least minimized, by effective intelligence operations, and to what extent the effectiveness of this country's intelligence complex may have been weakened by a national ennui and distaste directed at all intelligence and counterintelligence activities.

Spying, to depart from the euphemism, is a nasty business and one which should be deplored in the ideal world—a status which unfortunately has not been reached. Any naiveté we may have entertained regarding the covert ascertainment of knowing what other world forces do not deign to make public must certainly have been dispelled this past year by the disclosure that an elderly knight in England, and advisor for many years to the Queen, had been exposed as a Soviet spy and the fourth person in an espionage ring that passed United States atomic secrets to Moscow.

I decline to join in a realistically possible weakening of this country's intelligence operations by denigrating the necessarily insular concept of state secrets.