**NATIONAL LAWYERS GUILD, Plaintiff,**

v.

**ATTORNEY GENERAL, et al., Defendants.**

**No. 77 Civ. 0999 (CLB).**

United States District Court, S.D. New York.

Dec. 20, 1982.

---

Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for plaintiff.

Peter C. Salerno, Asst. U.S. Atty., New York City, for defendants.

SINCLAIR, Magistrate:

In Discovery Order No. 41 ("D.O. 41") this court reviewed a proposal by John A. Mintz, Assistant Director-Legal Counsel of the FBI, that the FBI be permitted to use a sampling technique in making its executive

privilege claims ("2F" deletions; state secrets) rather than claiming separately for every asserted privileged item. *See* D.O. 41 at 52.[1] Pursuant to the court's directions in D.O. 41, defendants have submitted proposed categories of state secrets with examples of their application. Plaintiff has responded thereto. For the reasons stated below, the sampling technique must be abandoned in favor of an item by item assertion of executive privilege claims. This opinion shall (1) discuss the law and procedure for assertion of state secrets claims, and (2) issue general directions regarding such claims of privilege.

## I

## BACKGROUND

The essence of the FBI's proposed sampling technique is this: the FBI would formulate categories for which state secrets claims may be asserted. It would then provide to the Attorney General the listing of those categories for his certification that the information contained in the categories requires protection as state secrets and for his confirmation that a random sampling of 2F deletions comport with the categories. An affidavit by the Attorney General, presumably detailing the above, would be submitted to the court.[2]

The proposal was considered as a means of alleviating the burdens encountered in a case involving a large volume of executive privilege claims.[3] While finding the proposal to be "generally acceptable" upon initial consideration, the court, aware of the lack of judicial precedent for a sampling procedure in state secrets cases, proceeded cautiously. As a next step, defendants were not directed to assert a formal claim of privilege utilizing the sampling procedures but rather to demonstrate that support existed for their proposed categories and that the categories were being correctly applied to a sampling of assertedly privileged material, thus testing again the viability of the sampling procedure before it was actually put to work.

On September 17, 1982 defendants submitted various materials to the court outlining the proposed categories and permitting the court to satisfy itself through in camera examination that allegedly privileged material was being properly categorized. The proposed categories are: (a) foreign government information, (b) intelligence activities or intelligence sources and methods, and (c) foreign relations or foreign activities of the United States.[4]

Plaintiff, which did not appeal from D.O. 41, responded to the defendants' implemen-

1. This proposal was a response to paragraph 6 of Discovery Order No. 26 ("D.O. 26") which requested proposals comparable to the procedures followed for informant file production, to be "devised to permit expeditious segregation of large groups of unproductive materials from the non-informant file universes so as to spare [all those involved] monumental wasted effort." D.O. 26 at 19.

2. The proposal was stated in full in D.O. 41 at 52.

 1) The FBI will prepare a second modified privilege log relating only to the deletions previously marked "2F". This log will list specific categories for which information has been deleted and each specific deletion made under each such category. 2) The FBI will provide to the Attorney General the listing of categories for his certification that they are in fact the types of categories for which state secrets claims may be asserted. 3) The FBI will also provide to the Attorney General the modified privilege log in order that he might randomly select an appropriate number of deletions from each of the categories. 4) The

 Attorney General then not only would determine whether information contained in the categories required protection as state secrets but he would be able to confirm by a random selection that the actual excisions comport with the generic categories. 5) The Attorney General's affidavit and the modified log then would be provided to the Court. (footnotes omitted)

3. Although there has been no precise statement by the defendants as to the exact number of executive privilege claims, a review by plaintiff of all the field office files on the NLG showed approximately 675 claims. *See* Krinsky letter dated October 26, 1982. Plaintiff has pointed to several factors which might reduce this number: duplication of 2F claims, the FBI's re-evaluation of 2F claims and claims falling within the scope of the informant's privilege. *Id.*

4. The definitions of these terms along with a discussion of the effect of disclosure on national security can be found in the Declaration of Peter W. Kellen, executed on August 19, 1982.

tation proposal by a memorandum dated October 15, 1982 ("Plaintiff's Response"), objecting to utilization of the proposed sampling technique in this case, and urging the court to require an item by item assertion of privilege. *See* Plaintiff's Response at 1–2. In addition, plaintiff criticized defendants' proposal in several respects, principally that it does not require the Attorney General to balance competing interests when deciding to assert a claim of privilege and that the categories are too broad.

While the court finds no major flaws in defendants' formulation of categories, a studied consideration of the law and procedure on the state secrets privilege compels the court to conclude that a sampling technique is incompatible with the established principles governing assertion of the privilege and that it must therefore be abandoned. It must be emphasized that although there has been considerable effort expended by all those involved in connection with the sampling proposal, the court does not view this time to have been counter-productive.[5] The court's analysis of the state secrets privilege at this juncture will undoubtedly expedite its subsequent adjudication of privilege claims. Further, the defendants' formulation of categories will

prove useful in organizing the state secrets claims. *See* the directions, *infra*, at 403.

The following discussion is an analysis of the law and procedure of the state secrets privilege.

## II

## DISCUSSION

A. *Generally.*

The starting point in an examination of the state secrets privilege is the Supreme Court case, *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (hereinafter "Reynolds"). Although the privilege had been in existence prior to *Reynolds,* that case is the definitive statement by the Court of the general principles which control its application.[6] The Court noted that although the privilege was well established in the law of evidence, the courts of this country have had limited experience with it. *Id.* at 6–7, 73 S.Ct. at 531.[7] Nevertheless, the court found ample precedent from which to formulate the stringent procedural requirements and the narrow standard of review applied to claims of state secrets privilege.

 The state secrets privilege can be broadly defined as a common law evidentiary privilege "that protects information not

---

**5.** It is the court's understanding that, regardless of whether the sampling procedure *is* adopted, the FBIHQ classification unit intends to review all 2F deletions to determine whether classification must be continued. *See* D.O. 41 at 52 n. 1. So presumably no wasted effort has been expended in this regard.

**6.** The precise origins of the privilege are unclear but it can be traced back to Aaron Burr's trial for treason. *See United States v. Burr,* 25 F.Cas. 30 (C.C.D.Va.1807) (No. 14, 692d) described and quoted in 8 Wigmore, Evidence § 2379, p. 799 (subpoena duces tecum issued by Chief Justice Marshall to President Jefferson to produce correspondence with General Wilkinson, over objection of government that it involved relations with France and Spain; C.J. Marshall: "There is certainly nothing before the Court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety ... if it does contain any matter which it would be imprudent to disclose, which it is not the wish ⸜of the Executive to disclose, such matter, if it

be not immediately and essentially applicable to the point, will of course be suppressed ... "). *See also* Note, The Military and State Secrets· Privilege: Protection for the National Security or Immunity for the Executive? 91 Yale L.J. 570, 571 n. 6 (1982) (hereinafter cited as Note, Military & State Secrets); R. Berger, Executive Privilege, at 215–24 (1974).

**7.** *See Totten v. United States,* 92 U.S. 105, 23 L.Ed. 605 (1875) (action on contract for wartime spying was dismissed because its maintenance would endanger the secrecy of such employments); *Firth Sterling Steel Co. v. Bethlehem Steel Co.,* 199 F. 353 (E.D.Pa.1912) (copies of weapons blueprints made by Navy and classified as secret excluded by court on objection, though witness did not claim privilege, recognizing "rule of public policy forbidding the disclosure of military secrets"). *See also Pollen v. Ford Instrument Co.,* 26 F.Supp. 583 (E.D.N.Y. 1939); *Cresmer v. United States,* 9 F.R.D. 203 (E.D.N.Y.1949).

officially disclosed to the public concerning the national defense or the international relations of the United States." 8 C. Wright & A. Miller, Federal Practice and Procedure ¶ 2019 at p. 158 (1970).[8] It permits the executive branch of the government to withhold information, although relevant to the litigation, which contains military secrets and secrets of state because disclosure would jeopardize the national security. *Reynolds, supra,* 345 U.S. at 10–11, 73 S.Ct. at 533.[9] The information protected is not strictly limited to military affairs but also includes matters relating to the national defense, foreign policy and foreign intelligence activities. *See, e.g., Halkin v. Helms,* 690 F.2d 977 (D.C.Cir.1982) ("Halkin II") (covert intelligence sources and joint cooperation between U.S. and foreign countries); *Salisbury v. United States,* 690 F.2d 966 (D.C.Cir.1982) (intelligence sources); *Halkin v. Helms,* 598 F.2d 1 (D.C.Cir.1978) ("Halkin I") (same); *United States v. Felt,* 502 F.Supp. 74, 76 (D.D.C.1980) ("Felt II") (foreign intelligence activities); *Sigler v. Le Van,* 485 F.Supp. 185, 192–194 (D.Md.1980) (same); *Jabara v. Kelley,* 75 F.R.D. 475 (E.D.Mich.1977) (intelligence sources); *United States v. Felt,* 491 F.Supp. 179 (D.D.C.1979) ("Felt I") (same); *see also* discussion on what constitutes state secrets, *infra,* at 401–402.

▮ Because successful invocation of the privilege leads to the unavailability of evidence which may be necessary to prove a party's claim, it is a privilege "not to be lightly invoked." *Reynolds, supra,* 345 U.S. at 7, 73 S.Ct. at 531; *Halkin* II, *supra,* 690 F.2d at 990.

*Reynolds* itself was an action brought under the Federal Tort Claims Act for the wrongful death of three (3) civilian observers who were on board a military aircraft which crashed during a flight taken to test secret electronic equipment. Plaintiff sought production of the Air Force's official accident investigation report. The Secretary of the Air Force filed a formal claim of privilege on behalf of the government, objecting to such production. A supporting affidavit, filed by the Judge Advocate General of the Air Force, asserted that the demanded material could not be furnished "without seriously hampering national security, flying safety and the development of highly technical and secret military equipment." *Reynolds, supra,* 345 U.S. at 5, 73 S.Ct. at 530. The Supreme Court, reversing both the district and circuit courts, upheld the claim of privilege.

B. *Procedure for Assertion Of Privilege By Executive Branch.*

▮ The privilege, which belongs to the government and can neither be claimed nor waived by a private party, is properly invoked only when certain procedural requirements are satisfied. *Reynolds, supra,* 345 U.S. at 7, 73 S.Ct. at 531. In *Reynolds,* Chief Justice Vinson set forth these stringent procedural requirements:

> There must be a (1) formal claim of privilege (2) lodged by the head of the department which has control over the matter, (3) after actual personal consideration by that officer (footnotes omitted; numbers added).

345 U.S. at 7–8, 73 S.Ct. at 531. In cases following *Reynolds* involving the state se-

---

8. Under Fed.R.Evid. 501 as it presently exists, federal common law supplies the principles governing privilege except in civil actions where state law supplies the rule of decision (in which cases state rules of privilege apply). *See generally,* 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 501[01]–[08] (1981) (hereinafter "Weinstein's Evidence"). As originally drafted, Article V of the Federal Rules contained 13 Rules which defined 9 separate privileges. Proposed Rule 509 covered secrets of state and other official information. *See generally* 2 Weinstein's Evidence ¶ 509[01]–[12].

9. The state secrets privilege is similar to the classified information exemption of the Freedom of Information Act (FOIA). 5 U.S.C. § 552(b)(1) (1976) (exempting from disclosure information that is properly classified and must remain secret in interest of national security). *See Military Audit Project v. Casey,* 656 F.2d 724, 736–38 (D.C.Cir.1981). Both protect against disclosure of information relating to national security.

crets privilege, courts routinely make a threshold finding that these formal requisites have been met. *See, e.g., Halkin* II, *supra,* 690 F.2d at 991; *Re Application of Eisenberg,* 654 F.2d 1107, 1110 n. 5 (5th Cir.1981); *Halkin* I, *supra,* 598 F.2d at 8 n. 6; *Jabara, supra,* 75 F.R.D. at 487–88; *Spock v. United States,* 464 F.Supp. 510, 518 n. 10 (S.D.N.Y.1978); *Kinoy v. Mitchell,* 67 F.R.D. 1, 8–10 (S.D.N.Y.1975).[10]

▇▇▇ The requirements that the privilege be asserted by the head of agency and that he personally consider the matter are derived from an English case quoted in *Reynolds:*

'The essential matter is that the decision to object should be taken by the minister who is the political head of the department and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced . . .' *Duncan v. Cammell, Laird & Co.,* [1942] A.C. 624, 638.

345 U.S. at 8, n. 20, 73 S.Ct. at 532, n. 20.

These are not merely technical requirements. Rather, their purpose is to insure that the privilege is claimed by someone in the executive branch with sufficient authority and responsibility so that the court can rely upon his judgment that the claim was prudently invoked. *See Kinoy, supra,* 67 F.R.D. at 9. At the very least, the executive officer must represent that he has personally considered the matter.[11] It goes without saying that failure to do so will preclude the court from further considering the claim of privilege. *Id.*[12] In general, there has been little judicial flexibility in relaxing these formal requisites. *Id.* at 9–10 ("It is of the utmost importance, first, that the Government comply with the

---

10. These formal requirements have been uniformly applied to all governmental privileges. *United States v. American Telephone & Telegraph Co.,* 86 F.R.D. 603, 605 (D.D.C.1979); *Kinoy, supra,* 67 F.R.D. at 11. The governmental privileges other than that for state secrets are qualified rather than absolute. They may be overcome by a litigant's showing of necessity for the requested information where the litigant's needs outweigh the governmental interest favoring secrecy. *Id.; United States v. Nixon,* 418 U.S. 683, 706–07, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). Among the matters protected from disclosure are the deliberative and decision-making processes of governmental officials, *see Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 40 F.R.D. 318, 324 (D.D.C. 1966), *aff'd,* 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967), the identity of informers cooperating in law enforcement, *see Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *Black v. Sheraton Corp. of America,* 371 F.Supp. 97 (D.D.C.1974), investigative reports of an administrative agency to the extent that they reflect advisory rather than factual material, *see J.H. Rutter Rex. Manufacturing Co., Inc. v. N.L.R.B.,* 473 F.2d 223, 232 (5th Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); *Carl Zeiss Stiftung, supra,* information pertaining to ongoing criminal investigations, *see Timken Roller Bearing Co. v. United States,* 38 F.R.D. 57 (N.D. Ohio 1964), and confidential communications between the President and his close advisors. *See United States v. Nixon, supra,* 418 U.S. at 703–13, 94 S.Ct. at 3105–10.

11. One commentator points out that actual personal consideration by the Secretary of Defense (referring to the agency head asserting the claim of privilege in *Reynolds* ) is illusory. How that department head arrives at his decision has been graphically described by Wigmore as a process in which subordinates prepare the memorandum, which then works its way up through channels, until it arrives upon the desk of the departmental head, who perfunctorily signs it without further consideration. *See R. Berger, supra* note 6, at 217 (quoting from 8 Wigmore, Evidence at p. 793). Wigmore's portrayal of the inner-workings of government agencies being particularly lifelike, one would imagine that in actuality the personal consideration requirement is often thwarted. Nevertheless, courts are consistent in requiring some minimum showing that it has been met.

12. *Kinoy, supra,* was an action brought by an attorney and his client for damages and injunctive relief based upon the allegedly unlawful electronic surveillance of telephone conversations to which they were parties. An affidavit filed by the U.S. Attorney General, claiming that the records pertaining to several interceptions were privileged, did not indicate that the Attorney General had personally considered the material as to which the claim of privilege had been lodged, nor that he personally had decided that it constituted a military or state secret. The court, also finding the affidavit to be of insufficient specificity, declined to recognize the government's claim of privilege. 67 F.R.D. at 9–10.

formal requisites for assertion of the claim.").[13]

It is this stringent prerequisite of personal consideration which constrains the court to forego use of a sampling technique. In light of the case law it is difficult to justify use of a sampling technique whose very purpose is to dispense with the Attorney General's personal consideration of every item for which a claim of privilege is to be lodged.

 Although there are no particular requirements as to the contents of the formal claim, in order to serve its intended purpose and to facilitate the court's evaluation of whether the material is properly subject to a claim of privilege, it must have a certain degree of specificity. *See, Kinoy, supra,* 67 F.R.D. at 9–10.[14] The affidavit should describe the disputed material in sufficient detail and the reasons for withholding the material should be set forth with reasonable specificity. *See, Salisbury, supra,* 690 F.2d at 971–72.

 Even where the allegedly privileged documents submitted for the court's in camera review may be fully self-explanatory, an affidavit lodging the formal claim must nonetheless specify the agency head's reasons for invoking the privilege. *See, Kinoy, supra,* 67 F.R.D. at 10.

 It must be emphasized that the affidavit will not be read in a vacuum. In *Halkin* II, *supra,* 690 F.2d at 992–93, plaintiffs argued that the CIA Director's affidavit was too vague to establish the privilege for material relating to the targets and means of CIA surveillance under a program known as Operation CHAOS. The D.C. Circuit, acknowledging that the Director's public affidavit was "necessarily unspecific," read it against the background of widespread public disclosures about Operation CHAOS and, taking into consideration the sensitivity of United States' diplomatic re-

---

**13.** In the one instance occasionally cited as one in which a particular agency head's personal consideration was dispensed with, there was in fact a proper affidavit from the head of the National Security Agency; what was lacking was one from the Secretary of Defense. The court found that cabinet officer's affidavit unnecessary because under the circumstances it would have been "of little or no benefit." *See Clift v. United States,* 597 F.2d 826, 828–29 (2d Cir.1979), *citing Association for Women in Science v. Califano,* 566 F.2d 339, 347–48 (D.C.Cir. 1977). In *Clift,* the plaintiff, an inventor of a cryptographic system, brought an action to recover compensation from the United States under the Intervention Secrecy Act, 35 U.S.C. § 181–88, claiming damages from a secrecy order and from the government's alleged use of his invention. Plaintiff moved for production of documents which included contracts for the manufacture of various government cryptographic devices. An affidavit submitted by the Director of the National Security Agency (NSA) stated that the contracts requested, containing information about cryptographic systems being developed by the government, were properly classified and contained military and state secrets, disclosure of which would impair the communications security mission of the NSA. The plaintiff objected to the government's claim of privilege on the ground that there was no formal claim made by the Secretary of Defense. The government argued in opposition that there was no need for a claim by that department head because the claim was made by Congress in 1951, when it enacted 18 U.S.C. § 798, making knowing and willful disclosure of classified cryptographic information to unauthorized persons a crime. 597 F.2d at 828.

Without explicitly rejecting the government's argument that a statute imposing criminal sanctions for disclosure of classified material obviated the personal consideration requirement (although clearly not adopting it), the court concluded that under the special facts of this case, the Secretary of Defense's personal involvement would "be of little, or no benefit." *Id.* at 829. Admonishing the government not to make this argument again, Judge Friendly stated, ". . . the Government would be wiser not to put courts to this test in the future." *Id.*

It seems clear that the court in *Clift* recognized that the NSA Director's affidavit served essentially the same function as it would have had the Secretary of Defense submitted it. And that even when faced with this technical departure from the procedural requirements, it cautiously circumscribed its holding to the "special facts here presented." *Id.*

**14.** It should be noted that the claim may be made by testimony in open court or by affidavit. In recent cases, the executive has relied extensively on *in camera* ex parte affidavits or testimony. *See, e.g., Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 269 (4th Cir.1980); *Halkin* I, *supra,* 598 F.2d at 9; *Felt* II, *supra,* 502 F.Supp. at 75–76.

lations, found the public affidavit alone sufficient to satisfy the requirements of the privilege. *Id.*

■ The need for specificity in the government's formal claim is not taken to illogical results. Where the Attorney General's affidavit fails to recite the words "state secrets," but instead recites that disclosure would adversely affect relationships with foreign intelligence agencies essential to the national security interest, the court will not find the claim improperly asserted. *See Felt* I, *supra,* 491 F.Supp. at 183.

C. *Standard of Review Applied to the Privilege Claim.*

■ The Supreme Court in *Reynolds, supra,* enunciated a limited standard of review to be applied to claims of state secrets privilege. A court need only be satisfied that "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged". *Reynolds, supra,* 345 U.S. at 11, 73 S.Ct. at 533 (hereinafter "reasonable danger standard"). The standard, as applied, essentially asks whether there is a reasonable danger that disclosure of the material will adversely affect the national security. *See, Felt* II, *supra,* 502 F.Supp. at 75; *Sigler v. Le Van, supra,* 485 F.Supp. at 195; *Jabara, supra,* 75 F.R.D. at 484.[15] In applying the

standard the courts accord the "utmost deference" to executive assertions of privilege. *See, Halkin* I, *supra,* 598 F.2d at 9, *citing United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).[16]

Not only is the standard of review non-stringent, but there is inherent elasticity in the term "national security".[17] Courts have not precisely defined the term. This allows for a great degree of flexibility when new kinds of information are sought to be protected. *See* Note, The Military and State Secrets Privilege: Protection for the National Security or Immunity for the Executive?, 91 Yale L.J. 570, 574 and n. 26 (1982) (hereinafter cited as Note, Military and State Secrets); *see also* discussion on what constitutes state secrets, *infra,* at 401–402.

■ The state secrets privilege being an *absolute* rather than a *qualified* privilege, the question arises whether the courts should, in evaluating the claim of privilege, consider the non-governmental litigant's need for the information and balance it against the government's interest in secrecy.[18]

Plaintiff contends that the privilege is, in fact, qualified and urges the court to adopt the position advanced by Judges Bazelon and Wright, dissenting in *Halkin* I, *supra,* 598 F.2d at 11–18, that the standard of review recited in *Reynolds* compels assess-

---

**15.** One commentator notes that the "reasonable danger" threshold refers only to the likelihood that disclosure *might* result in harm to the national security, and not to the likelihood of any harm actually occurring. *See* Note, Military and State Secrets, *supra* note 6, at 574 and n. 27.

**16.** In the analogous context of the national security exemption in the Freedom of Information Act (*see* n. 9, *supra*) courts should accord "substantial weight" to the affidavit of the agency. *See Halkin* I, *supra,* 598 F.2d at 9.

**17.** "National Security" has been described as "a prophylactic concept, concerned with potential dangers—with intangibles, uncertainties and probabilities rather than [with] concrete threats readily foreseeable and easily grasped." Note, National Security and the Amended Freedom of Information Act, 85 Yale L.J. 401, 411 and n. 56 (1976).

**18.** It should be noted at the outset that the context for this discussion is civil and not criminal cases. In the criminal context, the court must consider the defendant's need for information that is material to the preparation of his defense. The Supreme Court explained in *Reynolds, supra,* 345 U.S. at 12, 73 S.Ct. at 534.

The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.

ment of the countervailing interests in disclosure before upholding the claim of privilege and that the claim must be measured against the non-governmental party's need for the information. See Plaintiff's Response at 6 (footnote).

■ The weight of authority does not support this view but rather interprets Reynolds as not contemplating a balancing of interests approach. See, Halkin II, supra, 690 F.2d at 990; Halkin I, supra, 598 F.2d at 9; Kinoy, supra, 67 F.R.D. at 9; Sigler v. Le Van, supra, 485 F.Supp. at 193–94; see also Note, Military and State Secrets, supra, at 575 [19]; One leading decision is that of the Court of Appeals for the D.C. Circuit in Halkin II, supra, an action brought by protesters of the Vietnam War against officials of the CIA, FBI and other agencies for illegal surveillance. The D.C. Circuit affirmed the district court's finding that material which would disclose the identity of the plaintiffs who were subjected to CIA surveillance and would also disclose the means of such surveillance constituted state secrets. In discussing the proper inquiry into a claim of state secrets privilege as mandated by Reynolds, the D.C. Circuit stated:

[T]he critical feature of the inquiry in evaluating the claim of privilege is not a balancing of ultimate interests at stake in the litigation. That balance has already been struck. Rather, the determination is whether the *showing* of the harm that might reasonably seem to flow from disclosure is adequate in a given case to trigger the absolute right to withhold the information sought in that case.

690 F.2d at 990. This interpretation is consistent with the language in Reynolds, that once the court is satisfied that the material implicates military or state secrets, it is absolutely privileged from disclosure and "even the most compelling necessity cannot overcome the claim of privilege..." 345 U.S. at 11, 73 S.Ct. at 533.[20]

■ The balancing issue is not completely put to rest until the court deals with plaintiff's contention that the agency head, before invoking the privilege, must balance the public interest in disclosure against the injury that might be caused by revelation of the state secrets. See Plaintiff's Response at 4–7. Plaintiff cites as authority for this proposition United States v. American Telephone & Telegraph, 86 F.R.D. 603 (D.D.C.1979), where the court in a general discussion of governmental privileges stated:

In Jabara, supra, where the government claimed privilege for documents concerning interceptions to which plaintiff was a party or in which plaintiff's activities were discussed, the court was more candid in advocating a balancing approach to state secrets claims. 75 F.R.D. at 484. Nonetheless, it is not clear that the court actually considered plaintiff's need for the material in arriving at its decision to uphold the government's claim of privilege. Once it was determined that the government made a showing of "reasonable danger", the court failed to articulate any consideration of plaintiff's need for the material, although it had done so earlier to justify its in camera review, but instead concluded that it was absolutely protected from disclosure. Id. at 489.

19. But see American Civil Liberties Union v. Brown, 619 F.2d 1170, 1173–78 (7th Cir.1980); Jabara, supra, 75 F.R.D. at 484 (E.D.Mich. 1977). The court views ACLU and Jabara more as anomalies than as well-reasoned and legitimate challenges to the standard of review established in Reynolds.
In ACLU, supra, the question to be decided by the Seventh Circuit in a rehearing en banc was whether an Army Regulations and Field Manual relating to domestic intelligence activities and techniques contained state secrets. The court, without expressly saying that the standard of review for state secrets claims required balancing a litigant's need for the material against the government's interest in secrecy, found the existence of military secrets to be "sufficiently dubious" that the claim of privilege could be defeated if on remand the district judge determined that the material is needed by the plaintiffs. 619 F.2d at 1173. The dissent, in this 4–2 decision, found the majority to have ignored the clear mandate of Reynolds in its failure to apply the reasonable danger standard and its lack of deference to the executive assertions of privilege. Id. at 1174.

20. In fact, Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875), cited in Reynolds, supports dismissal of an action where simply to maintain the suit requires disclosure of military or state secrets. Where privileged documents are essential to the plaintiff's case, the action or parts thereof must be dismissed. See, Kinoy, supra, 67 F.R.D. at 9.

The requirement that a responsible officer assert the claims is surely not to substantiate the *legal* basis of the claim, for that is a question of law. Rather, the purpose is to assure that the privilege, which in any event is waivable, is not lightly claimed. Hence the requirement is that the claim be made by someone in a position of sufficient authority and responsibility to weigh prudently the competing considerations of making evidence available in litigation and protecting important government interests. The decision involves policy, not simply law ... [T]he decision is a matter of importance and not merely routine categorization of documents, and therefore should be made by a policymaker who can be assumed to have the larger public interest in mind.

86 F.R.D. at 605.

Several comments are in order. First, the statement above cannot be read to *require* the agency head to balance competing interests. It merely recites the general policy behind the requirement that a department head assert the claim. Second, it is not clear that the court's commentary on "governmental privileges" refers to claims of absolute privileges where the *judiciary* is not expected to balance competing interests. Indeed, the only case cited by that court in its discussion is *Black v. Sheraton Corp. of America,* 184 U.S.App. DC 46, 564 F.2d 531 (D.C.Cir.1977), which deals with the qualified governmental privilege protecting against disclosure of investigatory files. And, significantly, in *Black, supra,* there is no discussion suggesting that the agency head must balance competing interests.

The court has found only one state secrets case where this issue was raised, namely *Halkin* II, *supra,* 690 F.2d at 994 n. 65. In that case the plaintiffs argued that the district court had erred in not evaluating the CIA Director's claim of privilege against the terms of Executive Order 12065, 3 C.F.R. 190 (1979). They asserted that this Order, governing the classification of government information, imposed on intelligence officials the duty to "balance the public interest in disclosure against the harm to the national security" in determining not only whether to declassify classified information but also whether to claim the privilege for state secrets. *See* Executive Order 12065, § 3–303. The court noted that acceptance of this argument would require it to conclude that the Executive Order governing classification also governs assertions of state secrets privilege. The court found it unnecessary to express an opinion on this issue since Executive Order 12065 had been superseded by Executive Order 12356, signed by President Reagan on April 2, 1982 (effective August 1, 1982), which omits the balancing standard. *See* Executive Order 12356, Part 3. Therefore, it was held that "the district court's failure to require a showing that the [CIA] Director had 'balanced' the interests prior to claiming the privilege was at most harmless error". *Halkin* II, *supra,* 690 F.2d at 994 n. 65.

In view of *Halkin* II and the current Executive Order which omits a balancing standard, the court finds no direct support for *requiring* the Attorney General to balance competing interests before invoking the claim of state secrets privilege. This is not to say that the appropriate agency head cannot balance interests if he so chooses, but this court declines to require him to do so.

D. *Judicial Scrutiny of the Privilege Claim.*

 Although the courts are not expected to balance the interests of the parties when adjudicating claims of state secrets privilege, the needs of the non-governmental litigant should not be overlooked. A showing of necessity for the information is relevant in determining how deeply the court should probe in satisfying itself that the privilege is properly invoked. *Reynolds, supra,* 345 U.S. at 11, 73 S.Ct. at 533; *Halkin* II, *supra,* 690 F.2d at 990; *Halkin* I, *supra,* 598 F.2d at 9; *Kinoy, supra,* 67 F.R.D. at 9; *Jabara, supra,* 75 F.R.D. at 491–92.

■ The appropriate degree of judicial scrutiny into the state secrets claim posed a problem for the Supreme Court in *Reynolds.* Drawing parallels to judicial experience with the privilege against self-incrimination, the court recognized that too much judicial inquiry would force disclosure of the very thing sought to be protected, while a complete lack of judicial control would lead to abuses by the executive. 345 U.S. at 8–9, 73 S.Ct. at 532. The court, embracing the possibility that the "reasonable danger" standard might be met by looking at all the circumstances of the case without reference to the privileged matter itself, declined to require *in camera* inspection in every case. Where, however, there is a strong showing of need by the non-governmental party, *in camera* review is appropriate. *Id.* at 10–11, 73 S.Ct. at 533; *see Halkin II, supra,* 690 F.2d at 990 n. 54; *Halkin I, supra,* 598 F.2d at 9; *Jabara, supra,* 75 F.R.D. at 491–92; *Kinoy, supra,* 67 F.R.D. at 9; *see also Felt I, supra,* 491 F.Supp. at 184. But the court's scrutiny need not be as searching where the litigant's need can be met through alternative means. In *Reynolds,* for example, the court ruled that in camera submission of the desired documents—Air Force accident reports—was inappropriate since live witnesses were able to testify about the accident. 345 U.S. at 11, 73 S.Ct. at 533.

E. *What Constitutes State Secrets.*

Throughout the first half of this century material held privileged under this doctrine involved military matters only. *See, e.g., Firth Sterling Steel Co. v. Bethlehem Steel Co.,* 199 F. 353, 355 (E.D.Pa.1912) (weapons blueprints); *Cresmer v. United States,* 9 F.R.D. 203, 204 (E.D.N.Y.1949) (permitting discovery of Navy Board of Investigation reports in absence of military secrets); *see also Totten v. United States,* 92 U.S. 105, 107, 23 L.Ed. 605 (1875) (action on contract for wartime spying). In recent times the state secrets privilege has been expanded to include diverse matters, the disclosure of which would prejudice the national security.

■ Today, information regarding the United States' non-wartime foreign intelligence activities has been afforded protection. *See, e.g., Felt II, supra,* 502 F.Supp. at 76; *Sigler v. Le Van, supra,* 485 F.Supp. at 192–94. Privilege claims have been upheld for information tending to identify covert intelligence sources,[21] *see, e.g., Halkin II, supra,* (information concerning surveillance under CIA project, Operation CHAOS); *Salisbury, supra,* (documentation of National Security Agency (NSA) interception of foreign communications); *Halkin I, supra,* (same); *Jabara, supra* (information concerning interception of communications through national security electronic surveillance done for purpose of obtaining information concerning foreign-based international terrorist movement that represents a clear and present danger to national security); *Felt I, supra* (information reflecting foreign activity of Weathermen Organization), for material which could disclose the existence of liaison relationships between the United States and foreign countries, *see, e.g., Halkin II, supra; Felt II, supra; see also Sigler v. Le Van, supra* (memoirs of army intelligence agent revealing counterintelligence activities and dealings with foreign intelligence services), for material reflecting communications intercepted through electronic surveillance and relating to the national defense and international relations, *see, e.g., Halkin II, supra; Salisbury, supra; Halkin I, supra; Jabara, supra,* and for information regarding intelligence collection methods. *See, e.g., Salisbury, supra* (disclosure of documentation of NSA's interception of foreign communications would jeopardize efficacy of its intelligence collection methods); *Halkin I, supra,* (same).

Other types of information have been similarly protected. *See, e.g., Clift v. United States, supra,* (contracts for the manu-

**21.** Courts give the "utmost deference" to the executive's claim that information which appears harmless to the untrained judicial eye "can be useful information to a sophisticated intelligence analyst." *See American Civil Liberties Union v. Brown, supra,* 619 F.2d at 1177 (Pell, J., dissenting).

facture of cryptographic devices containing classified cryptographic information); *Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268 (4th Cir.1980) (military related contracts; military employee's job responsibilities); *Attorney General v. Irish People, Inc.,* 502 F.Supp. 63 (D.D.C.1980), *rev'd on other grounds,* 684 F.2d 928 (D.C.Cir.1982) (diplomatic communications); *Republic of China v. National Union Fire Ins., Co.,* 142 F.Supp. 551 (D.Md.1956) (memoranda of conversations between American and British officials concerning recognition of sovereign immunity of China).

■ The state secrets privilege will generally not protect material relating to an ongoing "domestic security" investigation. A qualified privilege is applicable though. *See, Kinoy, supra,* 67 F.R.D. at 14 (records of interceptions by electronic surveillance conducted for purpose of obtaining "information deemed necessary to protect the United States against the overthrow of the Government by force or other unlawful means", where subjects of surveillance are under continuing investigation, are not state secrets); *see also Jabara, supra,* 75 F.R.D. at 493–94.

■ Although several categories of information have repeatedly been the subject of state secrets claims, no hard and fast rules have been stated by the courts whereby such claims can be easily slotted into standardized categories. In each case the court must find that the claim was asserted properly and that there is a reasonable danger that disclosure might prejudice the national security.

F. *Prior Disclosure of State Secrets.*

■ Plaintiff has expressed the need for clarification concerning the effect of prior disclosures upon the claim of state secrets privilege. *See* Plaintiff's Response at 32–

35. A distinction must be drawn between prior disclosure of the *specific* information sought to be disclosed in the present case and prior disclosure of a *similar type* of information as that which is presently sought. Under general principles of evidentiary privilege, prior disclosure of the *specific* information sought to be disclosed waives the privilege. *See, e.g., Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957) (disclosure of informant's identity waives informant's privilege); *see generally,* 8 C. Wright & A. Miller, Federal Practice and Procedure, ¶ 2016 at p. 127 n. 71 (1970) (voluntary disclosure of facts in question is usually a waiver of privilege).[22]

On the other hand, disclosure of a type of information *similar* to that presently sought will not vitiate the state secrets privilege. *See, Salisbury, supra,* 690 F.2d at 971, *citing Halkin* I, *supra,* 598 F.2d at 9. In *Halkin* I, the plaintiffs sought disclosure of material which would reveal that their international communications had been intercepted by the National Security Agency (NSA) and disseminated to other agencies. The government asserted that confirming the identity of those whose communications were acquired by NSA "would severely jeopardize the intelligence collection mission of NSA by identifying present communications collection and analysis capabilities." *Halkin* I, *supra,* 598 F.2d at 5. The *Halkin* plaintiffs argued that, in an unrelated case the government had admitted that the communications of plaintiffs in that case had been acquired by the NSA and, therefore, in *Halkin* itself the government should be compelled to disclose the same type of information. The court rejected this argument, holding that "[t]he government is not estopped from concluding in one case that disclosure is permissible while in another case it is not". *Id.* at 9.

---

**22.** *Jabara, supra,* 75 F.R.D. at 492–93, is consonant with this general principle. There, the plaintiff sought disclosure of the name of the federal agency that had admittedly intercepted his communications. Where the name of this agency had been previously revealed in a report of the United States Senate Select Committee on Intelligence, the court would not uphold the privilege for this information. Although the case does not sufficiently reveal the contents and context of what had been disclosed in the Senate report, this court reads *Jabara* to be consistent with the proposition that where the specific information which is presently sought has been previously disclosed, the privilege is waived.

■ A corollary to this principle is that disclosure of an intelligence method or goal in a generalized way does not preclude protection of an intelligence method or goal which relates to a particular time and place and a particular target. *See Salisbury, supra,* 690 F.2d at 971 (NSA's admission that at one time it had monitored communications transmitted between United States and Hanoi does not preclude protection of information which would reveal particular channels monitored).

## III

## GENERAL DIRECTIONS REGARDING CLAIMS OF PRIVILEGE

■ 1. In view of the foregoing, formal claims of state secrets privilege ("2F" deletions) are to be made for every asserted privileged item. The procedural requirements discussed herein must be satisfied for each item. This includes the requirement that the Attorney General personally review each item for which he asserts the privilege.

2. No other privilege claims need be asserted for any deletion covered by a claim of informants' privilege until the court has issued its rulings on the informants' privilege. This is for obvious reasons. If the informants' privilege claims are upheld then deletions which can be justified on informants' privilege grounds need not be claimed on grounds of another privilege.

3. As it was noted earlier in this opinion (*see* n. 10), the procedural requisites set forth in *Reynolds, supra,* have been uniformly applied to all governmental privileges. *See United States v. American Telephone & Telegraph, supra,* 86 F.R.D. at 605; *Kinoy, supra,* 67 F.R.D. at 11. Included in this broad category of privilege is a qualified privilege for internal governmental deliberations and one for material relating to an ongoing criminal investigation. *See* cases cited, *supra,* at n. 10. The court directs that the procedural guidelines of *United States v. Reynolds, supra,* shall be satisfied for claims asserted under the qualified privileges stated above. This includes the requirement that the Attorney General must personally review each item for which he asserts privilege.

4. Although an evaluation of defendants' proposed categories in reference to the sampling technique has been mooted, the categories have been studied by the court in light of plaintiff's objections and they appear to be generally consistent with what cases have held constitutes state secrets. *See* discussion on what constitutes state secrets, *supra,* at 401–402. For this reason the court directs that they be utilized as a means of organizing the state secrets claims. Each item which is claimed to be a state secret shall be categorized as belonging to one or more of the three categories developed by defendants. *See generally* Declaration of Peter W. Kellen, dated August 19, 1982, for their definitions. This should cause little additional burden to defendants since the FBI intends to review all "2F" deletions anyway, *see* D.O. 41 at 52 n. 1, and the extra step of categorizing 2F deletions requires a minimum amount of energy.

5. Defendants shall submit to the court within forty-five (45) days a schedule of how they intend to complete assertion of *all* claims of privilege within the discovery deadline.

6. Submissions of formal claims of privilege shall be accompanied by a privilege log listing individually the items claimed, the evidentiary privilege(s) applicable (FBI deletion codes are sufficient) and any other helpful information, and in the case of state secrets claims, the further categorization required in ¶ 4.

7. As soon as defendants have designated the items for which claims of privilege will be asserted, they shall indicate to the court the approximate quantity of privilege claims, with a breakdown for different types of privilege (*e.g.* state secrets, internal deliberations, ongoing investigative files; again, the use of FBI deletion codes is sufficient). This information may be supplied to the court as it becomes available to the defendants, *i.e.,* on a piecemeal basis.